# IN THE SUPREME COURT OF IOWA

No. 11 / 04-0758

Filed May 5, 2006

**BRIAN GREEN, JERRY VAUGHAN,
TAD LEGGETT, and RODGER SMITH,**

    Appellants,

vs.

**RACING ASSOCIATION OF CENTRAL
IOWA, d/b/a PRAIRIE MEADOWS
RACETRACK & CASINO,**

    Appellee.

---

Appeal from the Iowa District Court for Polk County, Carla T. Schemmel, Judge.

Appeal from a district court judgment granting summary judgment to defendant on due-process and tortious-interference-with-contract claims. **AFFIRMED.**

Rick L. Olson, Des Moines, for appellants.

Thomas W. Foley and Debra L. Hulett of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellee.

**CADY, Justice.**

Four jockeys sued the Racing Association of Central Iowa, d/b/a Prairie Meadows (hereinafter RACI), alleging a violation of their due process rights and interference with their existing and prospective contracts when RACI excluded the jockeys from Prairie Meadows Racetrack & Casino. The district court granted RACI's motion for summary judgment, finding RACI was not a state actor, and that the jockeys' claim of tortious interference was insufficient as a matter of law. We affirm.

## I.     Background Facts and Proceedings

This case arose from allegations by a RACI employee, Ray Famous,[1] that four jockeys, Brian Green, Jerry Vaughn, Tad Leggett, and Rodger Smith, racially harassed him on August 6, 2002 at Prairie Meadows. The exact nature of the allegations does not affect this appeal, but they involved extremely offensive and threatening conduct. After Famous reported the incident to RACI human resources personnel, RACI notified the jockeys that they were "denied entrance and access to the facility of Prairie Meadows pending the outcome of a stewards hearing on the incident."[2] Furthermore, they were informed if they attempted to enter Prairie Meadows, they would be deemed trespassers and would be subject to arrest or citation. The Board of Stewards conducted an

---

[1]Famous was the jockey room custodian, a racing official under Iowa Administrative Code rule 491—10.4(11) (2001).

[2]Stewards are "racing official[s] appointed or approved by the [Racing and Gaming C]ommission to perform the supervisory and regulatory duties relating to pari-mutuel racing." Iowa Admin. Code r. 491—4.2(17A). The stewards are responsible for "monitor[ing], supervis[ing], and regulat[ing] the activities of occupational and pari-mutuel racetrack licensees," including investigating possible violations of racing and gaming rules by licensees. *Id.* r. 491—4.6(2). The jockeys are licensees. *See id.* r. 491—6.2(1) ("All persons participating in any capacity at a racing or gaming facility, with the exception of certified law enforcement officers while they are working for the facility as uniformed officers, are required to be properly licensed by the commission.").

investigation into the claim of misconduct. It interviewed Famous, the jockeys, and other witnesses. On August 19, the Board concluded "the investigation did not reveal evidence of a rule violation committed by an IRGC licensee." Immediately following the Board decision, RACI gave the jockeys notice that they were denied entrance or access to Prairie Meadows "pending an independent investigation by Prairie Meadows of alleged harassment."

RACI completed its investigation of the alleged incident on August 20. RACI concluded Jerry Vaughn would be allowed to re-enter Prairie Meadows with no further action taken. It decided Tad Leggett could re-enter if he apologized to Famous. However, Rodger Smith was banned from Prairie Meadows for the remainder of the season and could not return for the 2003 season unless he completed a diversity class. RACI permanently banned Brian Green from Prairie Meadows. The different actions were taken based on the different roles of the jockeys in the incident as determined by the investigation.

The jockeys filed a petition against RACI asserting a claim of intentional interference with contractual relations. On August 30, 2002, they amended their petition to add a claim that RACI violated their due process rights under the Iowa and United States Constitutions.[3]

---

[3]Presumably, the action was meant to be brought under 42 U.S.C. § 1983, although the amended petition did not refer to that statute. *See* 42 U.S.C. § 1983 (2004) ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .").

> A plaintiff in a § 1983 action must establish (1) that the defendants deprived the plaintiff of a right secured by the Constitution and laws of the United States, (2) that the defendant acted under color of state law, (3) that the conduct was a proximate cause of the plaintiff's damage, and (4) the amount of damages.

Following a hearing, the district court issued a temporary injunction on September 30, enjoining RACI from excluding Green and Smith from Prairie Meadows. RACI then moved for summary judgment. On April 7, 2004, the district court granted summary judgment in favor of RACI and dissolved the temporary injunction. The jockeys appeal.

## II. Standard of Review

We have previously defined our standard of review from orders granting summary judgment. Our review is for correction of errors at law. *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005). In reviewing the record, we are mindful that

> [a] motion for summary judgment should only be granted if, viewing the evidence in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Id.* (citations omitted).

## III. Due Process

The jockeys claim RACI deprived them of procedural due process when it excluded them from Prairie Meadows without prior notice and a hearing. They claim this action violated their rights under the Fourteenth Amendment to the United States Constitution and article I, sections 1 and 9 of the Iowa Constitution. Both constitutions prohibit the State from depriving a person of "property, without due process of law." U.S. Const. amend. XIV, § 1; Iowa Const. art. I, § 9. Yet, the provisions only limit state action. *Jensen v. Schreck*, 275 N.W.2d 374,

---

*Dickerson v. Mertz*, 547 N.W.2d 208, 214 (Iowa 1996) (citations omitted).

384 (Iowa 1979). They do not refer to individual activity. *Id.* Thus, RACI can only be liable under a due process claim if it was a state actor.[4]

It is undisputed that RACI is a private, nonprofit corporation, licensed to do business in Iowa and licensed by the Iowa Racing and Gaming Commission to conduct racing and gaming activities at Prairie Meadows Racetrack & Casino in Altoona, Iowa. Nevertheless, " 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains,' " conduct of a private actor may be deemed state action and subjected to constitutional standards. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 930, 148 L. Ed. 2d 807, 816-17 (2001) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 2786, 73 L. Ed. 2d 534, 546 (1982)).

> If the Fourteenth Amendment is not to be displaced, . . . its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself."

*Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 453, 42 L. Ed. 2d 477, 484 (1974)); *accord Principal Cas. Ins. Co. v.*

---

[4]The Supreme Court has repeatedly stated:

> "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights "fairly attributable to the State?"

*Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S. Ct. 2764, 2769-70, 73 L. Ed. 2d 418, 426 (1982) (citations omitted); *accord Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S. Ct. 2744, 2749, 73 L. Ed. 2d 482, 490 (1982) ("[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

*Blair*, 500 N.W.2d 67, 70 (Iowa 1993) ("Our inquiry must be whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as the action of the state." (citing *Jackson*, 419 U.S. at 358, 95 S. Ct. at 457, 42 L. Ed. 2d at 488)).

The Supreme Court has held that a sufficiently close nexus between the State and the challenged conduct to establish state action exists when the State and a private corporation are joint participants in the challenged activity based on their interdependence. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961). In *Burton v. Wilmington Parking Authority*, an African-American man claimed his rights under the Fourteenth Amendment were violated when a coffee shop in a city parking garage denied him service. *Id.* at 720, 81 S. Ct. at 859, 6 L. Ed. 2d at 49. The Wilmington Parking Authority, an agency of the State of Delaware, leased space in one of its parking garages to the business, a private corporation called Eagle Coffee Shoppe, Inc. *Id.* at 716, 81 S. Ct. at 857, 6 L. Ed. 2d at 47. The Authority provided gas and heat to Eagle and provided various repairs. *Id.* at 719-20, 81 S. Ct. at 858, 6 L. Ed. 2d at 49. In addition, improvements Eagle made to the premises were tax-exempt. *Id.* The Authority benefited from the lease arrangement by virtue of the $28,700 in rent it received annually from Eagle. *Id.* at 723, 81 S. Ct. at 861, 6 L. Ed. 2d at 51. Without the rent received from commercially leased portions of the parking buildings, they would have been an " 'unprofitable enterprise.' " *Id.*

> The Supreme Court found state action, reasoning,
>
> The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that

account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Id.* at 725, 81 S. Ct. at 862, 6 L. Ed. 2d at 52. The Court observed that "the relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits." *Id.* at 724, 81 S. Ct. at 861, 6 L. Ed. 2d at 51. In a later case, the Court called the arrangement between the parking authority and the coffee shop in *Burton* a "symbiotic relationship." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175, 92 S. Ct. 1965, 1972, 32 L. Ed. 2d 627, 638 (1972).

It is under this "symbiotic relationship" theory that the jockeys argue RACI is a state actor to which the Constitution applies. The jockeys claim RACI has a symbiotic relationship with Polk County because: (1) Prairie Meadows operates on public property leased from Polk County; (2) some members of RACI's board of directors are "appointed by and are intended to represent the Polk County Board of Supervisors"; (3) RACI "pays property taxes only by way of agreement with Polk County"; (4) Polk County receives lease payments in amounts the jockeys believe are excessive; (5) "The stated primary purpose of the operation of Prairie Meadows is to stimulate the economy of Polk County and the surrounding area"; and (6) Polk County depended on RACI "for revenue to pay off existing bonds that financed the purchase and building of" Prairie Meadows, which Polk County owns as realty.

RACI submitted several exhibits along with its statement of undisputed material facts showing the relationship between RACI and Polk County. Although RACI and Polk County initially functioned under an operating agreement, it was terminated in 1998 and replaced with a lease agreement. In the lease agreement, Polk County leased the Prairie Meadows premises (real estate and improvements) to RACI in exchange

for $1 million per month in rent for five years. In addition, RACI was to pay to Polk County the first $15 million of its net receipts generated in each calendar year from 1998 to 2000, the first $15.5 million of its net receipts generated in 2001, and the first $16 million of its net receipts generated in 2002. The lease further provided that Polk County had no obligation to make repairs or improvements or perform maintenance, and that RACI was responsible for paying all utilities for Prairie Meadows. Polk County would pay all real estate taxes, and RACI would pay any and all personal property taxes and special assessments. Further, the lease reserved the power for a county representative to enter Prairie Meadows and have access to RACI's books and records "in furtherance of [Polk County's] responsibility to the public and in protection of its property." Finally, the lease stated: "Nothing contained in this Lease shall constitute or be construed to be or create a partnership or joint venture between [Polk County], on the one part, and [RACI], on the other part."

Generally, a lease between a government entity and a private corporation "is insufficient, standing alone, to show state action." *Harvey & Corky Corp. v. Erie County*, 392 N.Y.S.2d 116, 118 (App. Div. 1977) (citing *Golden v. Biscayne Bay Yacht Club*, 530 F.2d 16, 33 (5th Cir. 1976)); *see also NBC v. Comm'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1028 (11th Cir. 1988) (lease did not provide "nexus or joint action sufficient to constitute state action"); *Greco v. Orange Mem'l Hosp. Corp.*, 513 F.2d 873, 880 (5th Cir. 1975) (lease insufficient when the private lessee "is ultimately responsible for the daily maintenance, upkeep, and operation of the facility," must "maintain and operate the hospital at its own expense and to hold the lessor harmless from any liability incurred in operating the facility," and must "provide adequate fire, tornado, and explosion insurance and in the event of any damage to use the proceeds

to repair the hospital"). Instead, it is only when there has been governmental involvement or a mutual conferring of benefits between the governmental lessor and the private lessee that courts have usually found state action. *See Ludtke v. Kuhn*, 461 F. Supp. 86, 93-94 (S.D.N.Y. 1978) (New York Yankees found to be state actors, in equal-protection action brought by female journalist excluded from Yankee locker-room, because they leased the stadium from the City of New York, "the annual rentals to be paid to the City for use of the stadium depend directly on the drawing power of Yankee games, and the City has in turn invested substantial sums of public money to enhance that drawing power by modernizing and improving the stadium itself," and "[a]dvertising and massive publicity about the Yankees and individual Yankee ballplayers is essential to the profitability of the Yankee Stadium"); *Niswonger v. Am. Aviation, Inc.*, 424 F. Supp. 1080, 1081 (E.D. Tenn. 1976) (private corporation operating airport in premises leased from city and county was a state actor because "the operation of airports and air navigation facilities in Tennessee is declared to be a public purpose," and the corporation was performing a public function).

In this case, the only evidence of county involvement in RACI's operations was that four of RACI's thirteen members on the board of directors were appointed by the Polk County Board of Supervisors. Other courts have found that the appointment of some of the corporate board members by a governmental entity does not transform the action of the corporation into action of the governmental entity. *See Kiracofe v. Reid Mem'l Hosp.*, 461 N.E.2d 1134, 1138 (Ind. Ct. App. 1984) (no state action although "the hospital's Board of Directors consist[ed] of twenty-one members, four of which are appointed by the Richmond City Council, the Wayne County Council, the Wayne Township Trustee, and

the Wayne County Commissioners"); *Renforth v. Fayette Mem'l Hosp. Ass'n,* 383 N.E.2d 368, 374 (Ind. Ct. App. 1978) (no state action when three of hospital's board of trustees were appointed by governmental entities; evidence was they "acted independently and did not report to the governmental bodies which elected them"); *Weston v. Carolina Medicorp, Inc.,* 402 S.E.2d 653, 658 (N.C. Ct. App. 1991) ("The appointment right [of county commissioners] of some but not all of the [hospital's board of] trustees, though indicative of state action, does not alone compel the conclusion that the suspension and revocation of [hospital doctor's] staff privileges constituted state action in this case."); *see also Crowder v. Conlan,* 740 F.2d 447, 451 (6th Cir. 1984) (no state action although two of hospital's thirteen-member board of trustees were public officials). However, the Supreme Court has considered it to be a factor in determining whether the private and public entities are so entwined that the private entity may be deemed a state actor. *See Brentwood Acad.,* 531 U.S. at 300, 121 S. Ct. at 932, 148 L. Ed. 2d at 820 (considering fact that "State Board members are assigned ex officio to serve as members of the board of control and legislative council").

With respect to the issue of whether Polk County and RACI mutually confer benefits on one another, it is obvious that Polk County benefits financially from the lease agreement with RACI, both directly, though rent and net-receipts payments, and indirectly, through stimulation of the local economy. In addition, RACI benefited from the original arrangement with Polk County in that when the legislature amended chapter 99F to allow slot machines at racetracks, Polk County issued more then $26 million in revenue bonds to pay for remodeling of Prairie Meadows to accommodate slots, acquisition of slot machines, and other start-up costs.

However, this mutual benefit does not mean that the state-action requirement is satisfied. *Burton* was the high watermark by the Supreme Court in the state-action arena, considering that the Wilmington Parking Authority was not directly involved in the Eagle Coffee Shoppe's decision to deny service to African-American customers. *See Burton*, 365 U.S. at 725, 81 S. Ct. at 861, 6 L. Ed. 2d at 52 ("But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be."). In later cases, the Court has significantly tempered its *Burton* holding, repeatedly stating that "where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discrimination[]' in order for the discriminatory action to fall within the ambit of the constitutional prohibition." *Moose Lodge No. 107*, 407 U.S. at 173, 92 S. Ct. at 1971, 32 L. Ed. 2d at 637 (quoting *Reitman v. Mulkey*, 387 U.S. 369, 380, 87 S. Ct. 1627, 1634, 18 L. Ed. 2d 830, 838 (1967)); *see Brentwood Acad.*, 531 U.S. at 295, 121 S. Ct. at 930, 148 L. Ed. 2d at 816-17 ("[C]onstitutional standards are invoked 'when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains.'" (Citation omitted; second emphasis added.)); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52, 119 S. Ct. 977, 986, 143 L. Ed. 2d 130, 145 (1999) ("Whether such a 'close nexus' exists, our cases state, depends on whether the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.' Action taken by private entities with the mere approval or acquiescence of the State is not state action." (Citations omitted.)); *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 195, 109 S. Ct. 454, 464, 102 L. Ed. 2d 469, 486-87 (1988) ("Neither UNLV's decision to adopt the NCAA's standards

nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance."); *Blum*, 457 U.S. at 1004-05, 102 S. Ct. at 2786, 73 L. Ed. 2d at 546-47 ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." (Citations omitted.)); *Jackson*, 419 U.S. at 357, 95 S. Ct. at 456-57, 42 L. Ed. 2d at 487 ("Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.' "). The key to *Burton* was that Eagle affirmatively contended that to serve African Americans "would injure its business." *Burton*, 365 U.S. at 725, 81 S. Ct. at 861, 6 L. Ed. 2d at 51. The Wilmington Parking Authority directly profited from Eagle's discrimination, and those profits were "indispensable elements in[] the financial success of a governmental agency." *Id.*

In this case, there is no indication Polk County profited at all from RACI's exclusion of the jockeys without notice or hearing. Furthermore, there is no indication Polk County or the county-appointed directors on the RACI board of directors participated in the decision to exclude the jockeys from Prairie Meadows. Rather, the undisputed evidence was that RACI's director of human resources made the decision to issue the

trespass notices to the jockeys. This evidence is significant because there must be some connection between the government and " 'the *specific conduct* of which the plaintiff complains' " for the government to be held responsible for the private actor's conduct. *Brentwood Acad.,* 531 U.S. at 295, 121 S. Ct. at 930, 148 L. Ed. 2d at 816-17 (citation omitted; emphasis added); *accord Gilmore v. City of Montgomery*, 417 U.S. 556, 573, 94 S. Ct. 2416, 2426, 41 L. Ed. 2d 304, 319 (1974) (stating the overriding concern is "whether there is significant state involvement in the private discrimination alleged" (citations omitted)). Our role in ascertaining this connection has been described as follows:

> The judicial obligation is not only to preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.

*Brentwood Acad.,* 531 U.S. at 295, 121 S. Ct. at 930, 148 L. Ed. 2d at 816-17 (citations, quotation marks, and brackets omitted); *see also Putensen v. Hawkeye Bank*, 564 N.W.2d 404, 408 (Iowa 1997) ("Constitutions were not designed to micromanage disputes between citizens, and, to resolve most lawsuits, citizens must resort to statutes and the common law. A state due process clause becomes implicated at the point where the power of the state is called upon by a private party in such a way as to deprive another of life, liberty or property."). Here, there was no evidence that Polk County controlled RACI's decision to exclude the jockeys. Moreover, when the connection is based on a benefit received by the county, it is not enough under *Burton* and its progeny to show that Polk County benefited generally from RACI's operation of Prairie Meadows. Rather, the jockeys had to show Polk

County benefited *from the constitutional violation alleged.* Only then could we say Polk County was *responsible* for the violation. There was simply insufficient involvement with Polk County, as a matter of law, to fairly attribute RACI's action to exclude the jockeys from Prairie Meadows to Polk County. The district court correctly granted summary judgment in favor of RACI on the jockeys' constitutional claim.

## IV. Intentional Interference with Existing and Prospective Contractual Relations

The jockeys also claim RACI tortiously interfered with existing and prospective riding contracts the jockeys had with horse-owners and trainers. The district court granted summary judgment to RACI on both claims. On appeal, the jockeys abandoned the claim of prospective contractual relations, and we consequently only consider the claim of interference with existing contracts.

The elements of the tort of intentional interference with an existing contract are:

> " '(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.' "

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001) (quoting *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 377 (Iowa 1997)). RACI conceded for purposes of summary judgment that the jockeys had contractual relationships with horse-owners and trainers, and RACI did not dispute that it knew of the relationships. Rather, RACI claimed it was entitled to summary judgment because there were no facts pertaining to the claim to establish the third element: intentional and improper interference. Thus, the crux of the argument on appeal boils

down to whether there are any facts associated with the jockeys' claim from which a rational jury could find intentional and improper interference. *Wilson v. Darr*, 553 N.W.2d 579, 582 (Iowa 1996) ("[T]he moving party may establish a right to summary judgment by establishing the limits of the other part[y's] proof. If those limits reveal that the resisting party has no evidence to factually support an outcome determinative element of that party's claim, the moving party will prevail on summary judgment." (citing *Griglione v. Martin*, 525 N.W.2d 810, 813-14 (Iowa 1994))); *accord Mason v. Vision Iowa Bd.*, 700 N.W.2d 349, 353 (Iowa 2005) (stating that to generate a genuine issue of material fact, the nonmoving party must present some evidence from which a reasonable fact-finder could find in that party's favor).

The intent to interfere with a contract does not make the interference improper. *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (citing Restatement (Second) of Torts § 767 cmt. *d* (1979)). The interference must be both intentional and *improper*. For purposes of a claim for intentional interference with a contract, the factors used to help determine if the challenged conduct was improper include:

1. The nature of the conduct.

2. The Defendant's motive.

3. The interests of the party with which the conduct interferes.

4. The interest sought to be advanced by the Defendant.

5. The social interests in protecting the freedom of action of the Defendant and the contractual interests of the other party.

6. The nearness or remoteness of the Defendant's conduct to the interference.

7. The relations between the parties.

*Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 767 (Iowa 1999); *accord* Restatement (Second) of Torts § 767, at 26-27.

In *Berger*, we quoted from *Restatement (Second) of Torts* section 767 comment *d*:

> "[I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight towards producing any determination that the interference was improper."

*Berger*, 543 N.W.2d at 599 (quoting Restatement (Second) of Contracts § 767 cmt. *d*). Thus, conduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract. *See id.* ("[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." (citing *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 (Iowa 1994))).

In this case, RACI supported its motion for summary judgment with evidence that the only reason it acted to exclude the jockeys from the track was to responsibly respond to the allegations that the jockeys racially harassed the jockey room custodian. It contends this undisputed fact means that if its conduct did interfere with the jockeys' riding contracts, the interference was not improper but only a consequence of actions taken for the purpose of satisfying its obligation under the law as an employer. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n,* 672 N.W.2d 733, 744 (Iowa 2003) (noting that an employer's failure to take proper remedial action in response to harassment by a nonsupervisory employee is an essential element of a

hostile-work-environment claim under the civil rights acts); *see also Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir. 1981) ("[E]mployer toleration of a discriminatory atmosphere alone gives rise to a cause of action by the [employee].").

We recognize a legitimate need of an employer to investigate the allegations of harassment in the workplace and, based upon the results of an investigation, to take responsible action against employees who harass other employees. *See Taylor*, 653 F.2d at 1199; *Farmland Foods, Inc.*, 672 N.W.2d at 744. Thus, we agree with RACI that if the evidence in this case only shows it acted for the purpose of satisfying its legal obligation to protect the interests of employees and to maintain a hostility-free work environment, then there can be no viable claim for interference with a contract. The factors used to determine the existence of improper conduct support this conclusion. *See Revere Transducers, Inc.*, 595 N.W.2d at 767 (listing factors). If the sole motive is a legitimate purpose derived from the law, then any interference is not improper as a matter of law. *See Berger*, 543 N.W.2d at 599 ("[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." (Citation omitted.)). *See generally* Restatement (Second) of Torts § 767 cmt. *b*, at 28 ("The rules stated in §§ 768-774 show[] the results of the balancing process in some specific situations that have been the subject of judicial decision; but they do not constitute an exhaustive list of situations in which it has been determined that an intentional interference with contractual relations is not improper.").

When a motion for summary judgment is properly supported, the nonmoving party is required to respond with specific facts that show a genuine issue for trial. *See Hlubeck v. Pelecky*, 701 N.W.2d 93, 95-96

(Iowa 2005) ("[T]he nonmoving party may not rest upon the mere allegations of his pleading but must set forth specific facts showing the existence of a genuine issue for trial." (citing Iowa R. Civ. P. 1.981(5); *Hoefer v. Wis. Educ. Ass'n Ins. Trust*, 740 N.W.2d 336, 338-39 (Iowa 1991))). This means the jockeys in this case were required to set forth some facts in resisting RACI's motion for summary judgment that could support the existence of an improper motive.

The jockeys failed to point to any facts in resisting the motion for summary judgment to show RACI's motive was improper. In fact, they offered no facts bearing on the issue of motive in resisting the summary judgment motion, but only made conclusory allegations that RACI's actions were improper. Moreover, the jockeys did not remedy this deficiency when they provided the trial judge with a copy of the complete temporary-injunction record at the summary judgment hearing. Our rules require a nonmoving party to identify the *specific facts* that show the existence of a genuine issue for trial. Iowa R. Civ. P. 1.981(5). When, as in this case, a party resisting summary judgment seeks to generate a fact issue on an actor's motive, that party must identify specific facts that reveal the alleged underlying motive. *See Hoefer*, 470 N.W.2d at 338-39 ("While intentional torts . . . are generally poor candidates for summary judgment because of the subjective nature of motive and intent the rule is not absolute and, . . . 'there is no genuine issue of fact if there is no evidence.' Put another way, the party resisting summary judgment 'may not rest upon the mere allegations or denials of his pleading.' The resistance must set forth specific facts constituting competent evidence to support a prima facie claim." (Citations omitted.)).

Notwithstanding, the jockeys argue that an inference of an improper motive can be drawn from the undisputed facts offered by RACI

in its motion for summary judgment. They claim RACI's threat to arrest the jockeys and the severity of the RACI's responsive action, as well as RACI's decision to pursue an independent investigation following the stewards' investigation, all support an inference of an improper motive.

We recognize that a nonmoving party is entitled to all reasonable inferences in a motion for summary judgment. *See Perkins v. Wal-Mart Stores, Inc.*, 525 N.W.2d 817, 818 (Iowa 1994) ("[S]ummary judgment is like a directed verdict: Every legitimate inference that reasonably can be deduced from the evidence should be given to the nonmoving party."). However, the requirement to identify specific facts in response to a summary judgment motion includes the requirement to identify those facts that support the inference sought to be drawn. The jockeys have not done so.

## V. Conclusion

RACI was entitled to summary judgment on the jockeys' due process claim because RACI is not a state actor. RACI was also entitled to summary judgment on the jockeys' tortious interference claims. We affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Wiggins, J., who takes no part.