# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-2633

_____

CRST Expedited, Inc.

*Plaintiff - Appellant*

v.

Transam Trucking, Inc.

*Defendant - Appellee*

_____

No. 18-2752

_____

CRST Expedited, Inc.

*Plaintiff - Appellee*

v.

Transam Trucking, Inc.

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: October 16, 2019
Filed: May 27, 2020

_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

CRST Expedited, Inc. (CRST) sued TransAm Trucking, Inc. (TransAm), alleging TransAm wrongfully recruited and hired several long-haul truck drivers who were under contract with CRST. The district court denied TransAm's motion to dismiss and both parties moved for summary judgment. The district court granted TransAm's motion for summary judgment and dismissed all of CRST's claims with prejudice and denied CRST's motion. CRST appeals the adverse grant of summary judgment and TransAm cross appeals the district court's denial of TransAm's motion to dismiss finding that the drivers were not indispensable parties. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further consideration.

I.

CRST is a long-haul trucking company. After suffering from a persistent shortage of drivers, CRST identified one of the primary causes of the shortage as the significant costs associated with becoming a trained, licensed driver. To work as a long-haul truck driver, potential drivers must obtain a commercial driver's license (CDL), which is normally obtained through a driver-training program. To address this cause of the shortage, CRST developed its own driver-training program in which it advances the cost of tuition and other expenses in exchange for the driver's agreement to work for CRST for a specified period of time. Specifically, prior to the start of training, the driver signs a pre-employment agreement in which the driver

-2-

agrees that the costs of training are an advance, and the driver must accept an employment contract with CRST if offered. Under the employment contract, the driver agrees to work for CRST for at least ten months (Restrictive Term). The driver also agrees to a non-compete provision: the driver will not work for any CRST competitor for the remainder of the Restrictive Term if he or she is discharged or leaves employment prior to the end of the Restrictive Term. During the Restrictive Term, CRST compensates the driver at a reduced rate so as to partially recoup the costs of the training program. Upon the conclusion of the Restrictive Term, the employment becomes at-will and the drivers are compensated at the market rate for long-haul truck drivers.

This case involves 167 drivers who were subject to the CRST employment contract but left CRST to work for TransAm.[1] TransAm is also a long-haul trucking company and competes with CRST in the qualified driver market. Unlike CRST, TransAm does not operate its own driver-training program. TransAm recruits CDL-holding drivers by using standardized advertising methods in which the recruits must initiate contact with TransAm. As part of the recruiting process, TransAm offers to reimburse its recruits up to $6,000 for the cost of obtaining their CDLs. However, this offer does not extend to drivers who obtained their CDLs through a training program offered by another trucking company. During the recruiting process, TransAm does not ask its recruits if they are under contract with another company. Only upon hiring the recruit does TransAm verify his or her prior employment, as required by law. 49 C.F.R. § 391.23 (requiring motor carrier to verify prior employment for each driver it employs).

---

[1] On appeal, the parties dispute how many drivers' Restrictive Terms had expired by the time TransAm hired them. There is no dispute, however, that a majority of the drivers left CRST before the expiration of the Restrictive Term and were still subject to the non-compete provision at that time.

For each of the 167 drivers at issue, TransAm sent employment verification requests to CRST. CRST responded to TransAm, noting that the drivers were under agreement with CRST. CRST also sent several follow-up letters, warning TransAm that CRST would not release its drivers from their contracts and citing another CRST lawsuit in which a different company had been enjoined from interfering with similar CRST contracts. Finally, in May 2014, CRST sent a cease-and-desist letter to TransAm. CRST alleges that, even after receiving the several letters detailing the drivers' contractual obligations with CRST, TransAm continued to hire its drivers.

In April 2016, CRST filed a lawsuit against TransAm, alleging intentional interference with a contract, intentional interference with a prospective economic advantage, and unjust enrichment. TransAm moved to dismiss the complaint on the basis that the drivers were necessary and indispensable parties. The district court denied the motion, finding the drivers were not indispensable parties, and subsequently denied TransAm's motion for reconsideration of that ruling. TransAm later moved for summary judgment, and the district court granted its motion. As to the intentional interference with a contract claim, the district court determined that, while CRST had presented sufficient evidence as to the contract and knowledge elements of the claim, it failed to provide sufficient evidence to preclude summary judgment as to the causation element. Thus, the district court did not reach the remaining elements of the intentional interference claim. As to the unjust enrichment claim, the district court found that TransAm received no benefit from CRST, and in any case, its claim of unjust enrichment depended upon TransAm's tortious conduct, as to which the district court had already determined there was insufficient evidence.[2]

_____

[2]The district court also granted TransAm's motion for summary judgment on CRST's intentional interference with a prospective economic advantage claim, which CRST does not appeal.

-4-

## II.

CRST argues the district court erred in granting TransAm's motion for summary judgment on the intentional interference with a contract and unjust enrichment claims. "Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." J.E. Jones Const. Co. v. Chubb & Sons, Inc., 486 F.3d 337, 340 (8th Cir. 2007). "We review a district court's grant of summary judgment de novo, including its interpretation of state law." Raines v. Safeco Ins. Co. of Am., 637 F.3d 872, 875 (8th Cir. 2011). The parties do not dispute that Iowa law governs this diversity action.

## A.

CRST argues the district court erroneously determined CRST did not present sufficient evidence of the intentional interference with a contract claim to preclude summary judgment. Iowa courts apply the Restatement (Second) of Torts in analyzing intentional interference claims. See Kern v. Palmer Coll. of Chiropractic, 757 N.W.2d 651, 662 (Iowa 2008) (relying on the Restatement (Second) in intentional interference case). To establish a claim for intentional interference with a contract, the plaintiff must show: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." Green v. Racing Ass'n of Cent. Iowa, 713 N.W.2d 234, 243 (Iowa 2006) (quoting Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 399 (Iowa 2001)). While the intentional interference elements are distinct and severable, the elements significantly overlap under the factual circumstances of this case.

The district court found that, while there was sufficient evidence to support the first two elements, the existence of a valid contract between CRST and the drivers and TransAm's knowledge of the contract, there was not sufficient evidence to support the causation element. For the reasons that follow, we conclude that the district court erred with respect to the causation element but did not err with respect to the existence of a valid contract element. We also conclude that the record contains sufficient evidence to support the intentional and improper interference element.

i.

We begin by addressing the causation element: whether TransAm's actions caused the drivers not to perform their contracts with CRST. The district court held there is no genuine issue of material fact on the element of factual causation because there is no evidence TransAm induced the drivers to breach or that the drivers would not have breached their contracts absent TransAm's involvement. We disagree. In analyzing causation, Iowa courts apply the traditional but-for standard. Sweeney v. City of Bettendorf, 762 N.W.2d 873, 883 (Iowa 2009). With respect to the causation element, the Restatement (Second) of Torts, which Iowa courts have adopted, see Kern, 757 N.W.2d at 662, provides: "The question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact." Restatement (Second) of Torts § 766 cmt. o. One method of inducement is "[i]nducement by offer of better terms." Id. § 766 cmt. m. However, "[o]ne does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person." Id. § 766 cmt. n.

CRST presented substantial evidence from which a reasonable juror could conclude that TransAm entered into agreements with the drivers not only with the knowledge that the drivers were under contract with CRST, and thus could not perform both contracts, but also with knowledge that its driver agreements provided for a higher rate of pay than provided for under the CRST-driver contracts. As noted above, CRST compensates its drivers below the market rate for long-haul truck drivers during the length of the Restrictive Term so as to partially recoup the training costs it advanced its drivers. Unlike CRST, TransAm does not incur those training costs, and as a result, it can offer its recruits a higher rate immediately. Compare R. Doc. 156-8, at 185-86 (CRST pay scale) with R. Doc. 167-9, at 52 (TransAm pay scale). Further, while TransAm offers to reimburse its recruits for the costs associated with obtaining their CDLs, CRST presented evidence that TransAm's reimbursement program does not extend to drivers who have obtained their CDLs through programs operated by other trucking companies. R. Doc. 167-9, at 166. This evidence suggests that CRST drivers are particularly attractive to TransAm because they have already been trained and licensed via CRST's training program yet do not qualify for the reimbursement program. Thus, CRST-trained drivers are less expensive for TransAm to employ than drivers who have not been trained by TransAm's competitors.

TransAm discounts this evidence of causation, asserting that TransAm could not have knowingly offered the drivers superior terms because it lacked knowledge of the terms of the CRST-driver contracts. However, knowledge of the contract is a separate element of the intentional interference claim, which the district court found CRST had satisfied and is not an element in dispute on appeal. Even assuming it is appropriate to address knowledge within the causation context, CRST presented sufficient evidence to create a factual dispute as to whether TransAm knew the drivers were subject to a contract with CRST in which the drivers would necessarily be paid less than market rate. CRST sent several notices to TransAm, informing TransAm that the drivers were under contract and pointing TransAm to CRST's other

lawsuit involving similar claims. R. Doc. 156-5, at 147; R. Doc. 167-5, at 1; R. Doc. 2-2, at 1. CRST also presented evidence that TransAm continued to hire its drivers even after CRST filed the instant lawsuit. Specifically, TransAm provided in its answer to an interrogatory the dates that the drivers started with TransAm, several of which occurred after the complaint was filed in April 2016. R. Doc. 155-2, at 20-28. The various letters and the complaint in this case outline the structure of CRST's training program, including the fact that the drivers are compensated below market rate so CRST can partially recoup the costs of the training program. Thus, a reasonable fact finder could determine that TransAm knew that it was offering the drivers better terms, i.e., market rate, than those provided under the CRST contract.

Nevertheless, we reject CRST's contention that any prospective employer offering terms it knows are better than an employee's fixed-term contract with his present employer commits tortious interference with that contract. The Restatement draws a clear distinction between contracts that include non-compete provisions and those that do not. With regard to an employee subject to a contract that does not include a non-compete provision, a competitor is "free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination." Restatement (Second) of Torts § 768 cmt. i. The employer "may offer better contract terms, as by offering an employee of the plaintiff more money to work for him . . . without liability." Id. However, in circumstances in which an employee is subject to a non-compete provision, "a defendant engaged in the same business might induce the employee to quit his job, but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete." Id. Based on this distinction, the intentional interference with a contract inquiry asks not merely whether TransAm induced the drivers to work for it by offering superior terms. Instead, the inquiry is more properly framed as whether TransAm intentionally induced the drivers to work for TransAm, by offering superior terms, in an activity that would mean violation by the drivers of the non-compete provision, and thus intentionally and improperly interfered with the CRST contract.

The non-compete provision contained in the CRST-driver contracts provides that the employee "will not directly or indirectly provide truck driving services to any CRST Competitor" during the Restrictive Term. R. Doc. 156-3, at 24-25. But for the decision made by TransAm, a CRST competitor, to extend offers and employ the drivers, the drivers would not be in breach of the non-compete provision. While some drivers had initial contact with TransAm only after leaving CRST and some drivers were also applying to companies other than TransAm, a reasonable fact finder could conclude that the drivers would not have violated the non-compete provision absent TransAm's act of hiring. Although some of the drivers contacted TransAm only after leaving CRST, CRST presented evidence that many drivers return to CRST after a period of absence, suggesting the drivers would not have violated the non-compete provision had TransAm not hired them. R. Doc. 167-9, at 326. And although some drivers applied to companies other than TransAm, CRST presented evidence that at least one other trucking company does not hire drivers who are subject to non-compete provisions. R. Doc. 167-9, at 339-40.

Accordingly, we find CRST presented sufficient evidence to create a genuine issue of material fact with regard to the causation element. Additionally, as discussed above, although the district court did not address the issue, we find that the summary judgment record contains sufficient evidence to support a finding that TransAm intentionally and improperly interfered with the CRST-driver contracts.

ii.

TransAm argues that even if CRST presented sufficient evidence on the causation and intentional and improper elements, we may affirm the judgment on the basis that CRST has not established the first element of the intentional interference

claim: that there was a valid contract between CRST and the drivers.[3] On appeal, TransAm concedes that CRST and the drivers entered into employment contracts but asserts that CRST cannot satisfy this element because the non-compete provision is an unenforceable restrictive covenant. Specifically, TransAm argues the non-compete provision is unenforceable because it does not protect a legitimate business interest, its terms are broader than necessary to protect the stated interest, and it amounts to a lifetime ban from the trucking industry.

In the context of an intentional interference claim, the Restatement distinguishes between void contracts and voidable ones. A void contract is "[a] promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor." Restatement (Second) of Contracts § 7. A third-party is not liable for interference with a void contract because it cannot have been "in force and effect at the time of the breach," in that it was never a legally effective contract. Restatement (Second) of Torts § 766 cmt. f. A voidable contract is valid until a party to the contract seeks to avoid it, and "[u]ntil [that party] does, the contract is a valid and subsisting relation, with which [the third party] is not permitted to interfere improperly." Id. Here, the drivers have never sought to avoid the CRST contract. Thus, in order to find the contract invalid for purposes of CRST's intentional interference claim, TransAm would need to show that the non-compete provision was void ab initio.

---

[3]Because the district court determined that CRST had satisfied the contract element, CRST did not brief this element in its opening brief. However, we address TransAm's argument because CRST does not assert that TransAm improperly raised this argument on appeal, and we may "affirm on any basis supported in the record." Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 670-71 (8th Cir. 2013).

Iowa courts generally enforce non-compete provisions. <u>Iowa Glass Depot, Inc. v. Jindrich</u>, 338 N.W.2d 376, 381 (Iowa 1983) ("The general rule in Iowa is that we will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest."). Further, Iowa law allows even unreasonable non-compete provisions to be "enforced to whatever extent [the court] find[s] reasonable under the long established rule." <u>Farm Bureau Serv. Co. of Maynard v. Kohls</u>, 203 N.W.2d 209, 211 (Iowa 1972) (finding the scope of the restrictive covenant to be unreasonable but reversing the finding of voidness). Because even unreasonable non-compete provisions may be partially enforced under Iowa law, TransAm's arguments aimed at the reasonableness of the non-compete provision challenge the contract as voidable, not void ab initio. The drivers did not seek to avoid the contract prior to the interference, and thus TransAm's voidable arguments are irrelevant for the purposes of CRST's intentional interference claim.

TransAm's argument that the non-compete provision operates as a lifetime ban from the trucking industry merits more discussion because such a lifetime ban may render the contract void. The Iowa Supreme Court has recognized that non-compete "contracts are always subject to the test of whether their purpose is contrary to public policy, and if there is any credible evidence to sustain a finding that they are deliberately unreasonable and oppressive, such covenants must be held invalid whether severable or not." <u>Ehlers v. Iowa Warehouse Co.</u>, 188 N.W.2d 368, 374 (Iowa), <u>reh'g denied and opinion modified</u>, 190 N.W.2d 413 (Iowa 1971) (quoting <u>Fullerton Lumber Co. v. Torborg</u>, 70 N.W.2d 585, 592 (Wis. 1955)); <u>see</u> Restatement (Second) of Torts § 774 ("Illegal agreements and those in violation of public policy are commonly held to be entirely void and so not contracts at all."); <u>Harvey v. Care Initiatives, Inc.</u>, 634 N.W.2d 681, 684 n.4 (Iowa 2001) ("We also recognize that a contract in violation of public policy is void."). Assuming that Iowa courts would find a non-compete provision that amounts to a lifetime ban void as against public

policy, we find that a plain reading of the non-compete provision in this case does not support such an interpretation. See DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C., 891 N.W.2d 210, 216 (Iowa 2017) ("[W]hen we interpret contracts, we look to the language contained within the four corners of the document.").

Here, the non-compete provision limits the driver's ability to work for a competitor "for a period equal to the greater of the Restrictive term and the duration of CRST's employment of Employee." R. Doc. 156-3, at 24-25. The Restrictive Term is defined as "any period of the Term remaining after the termination of CRST's employment of Employee with or without cause by either party." R. Doc. 156-3, at 24-25. For most of the drivers at issue, the Restrictive Term is a period of 10 months. TransAm interprets this language to mean if a driver quits with time left on his Restrictive Term, he would be barred from working for a CRST competitor indefinitely or until he returned to CRST to finish out his Restrictive Term. However, we agree with the district court that the non-compete provision plainly restricts the driver from working for a competitor for only that portion of the 10-month Restrictive Term which remains as of the date the driver leaves CRST. Such a non-compete provision is short and reasonable. See Orkin Exterminating Co. v. Burnett, 146 N.W.2d 320, 324 (Iowa 1966) (upholding non-compete provision that restricted the employee from working in the same business within ten miles of any town in which the employee performed services for three years where the non-compete provision itself was a major inducement in employment); see also Rasmussen Heating & Cooling, Inc. v. Idso, 463 N.W.2d 703, 704 (Iowa Ct. App. 1990) ("An examination of recent Iowa cases reveals that our Supreme Court has not enforced a covenant that extended beyond five years. Typically, the duration of a disputed covenant ranges from two years to three years."). Thus, the non-compete provision is not void in violation of public policy.

Accordingly, as a matter of law, we find the CRST employment contract is valid for the purposes of its intentional interference with a contract claim. The district court did not err with respect to this determination.

Finally, because the parties did not brief the remaining elements of the intentional interference with a contract claim, we decline to address them here and leave them for the district court to consider on remand.

B.

CRST also argues the district court erred in granting TransAm's motion for summary judgment on CRST's unjust enrichment claim. "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive . . . benefits without paying just compensation." State Dep't of Human Servs. ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 154 (Iowa 2001). It "is a broad principle with few limitations." Id. at 155. To recover under a theory of unjust enrichment, the plaintiff must establish: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." Id. at 154-55.

The district court found there was insufficient evidence that there was a benefit conferred on TransAm at the expense of CRST and that it would be unjust for TransAm to retain the alleged benefit. This conclusion was in error. First, in the unjust enrichment context, "[t]he word 'benefit,' . . . denotes any form of advantage." Handlos v. Intercreditor Comm., 838 N.W.2d 870 (Iowa Ct. App. 2013) (quoting Okoboji Camp Owners Co-op v. Carlson, 578 N.W.2d 652, 654 (Iowa 1998)). "[B]enefits can be direct or indirect, and can involve benefits conferred by third parties." Unisys, 637 N.W.2d at 155. Here, TransAm received the benefit of drivers who were trained at CRST's expense. The profits reaped by TransAm as a result of

-13-

hiring these drivers are at the very least an indirect result of CRST's financial investment in the drivers' training. TransAm's hiring of drivers for whom it did not have to pay or reimburse for the necessary training allowed TransAm to realize larger profits from the drivers' labor.

Second, whether it is unjust to profit at another's expense depends on the circumstances. See Johnson v. Leonard, 928 N.W.2d 149 (Iowa Ct. App. 2019) (finding "it is not unjust to allow the defendant to retain the benefit under the circumstances presented"). One such circumstance in which it may be unjust to retain a benefit is in the context of "contracts, torts, or other predicate wrongs." Unisys, 637 N.W.2d at 154. As detailed above, there is sufficient evidence to create a factual dispute as to whether TransAm intentionally and improperly interfered with the contracts between CRST and the drivers. Thus, because there is sufficient evidence to show that TransAm engaged in tortious conduct, there is sufficient evidence to create a factual dispute as to whether TransAm unjustly retained a benefit.

Accordingly, we conclude the district court erred in granting TransAm's motion for summary judgment on CRST's unjust enrichment claim.

## III.

In its cross-appeal, TransAm argues the district court erred in denying its motion to dismiss on the basis that the drivers were not indispensable parties pursuant to Federal Rule of Civil Procedure 19(b).[4] We review Rule 19(b) determinations for

---

[4]It is unclear whether we have jurisdiction to review the district court's denial of TransAm's motion to dismiss where, as here, we are reversing summary judgment in favor of the defendant. See Bradford v. Huckabee, 330 F.3d 1038, 1040 & n.3 (8th Cir. 2003) ("The denial of a motion to dismiss is not usually immediately appealable because it is not a final order."). Regardless, we may address the issue of nonjoinder of an indispensable party sua sponte. See 7 Charles Alan Wright & Arthur R. Miller,

-14-

an abuse of discretion. <u>Pembina Treaty Comm. v. Lujan</u>, 980 F.2d 543, 545 (8th Cir. 1992). Under Rule 19, the district court must first decide whether an absent party is necessary to the action. Fed. R. Civ. P. 19(a). If the absent party is necessary but cannot be joined because joinder would defeat diversity, then the court must next "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In making this determination, the factors that the court considers include: (1) the extent to which judgment rendered in the person's absence might prejudice that person or existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. <u>Id.</u>

Here, the district court found that the drivers were necessary parties but could not be joined because they would defeat diversity jurisdiction. The court then carefully considered and weighed each factor in determining that the drivers were not indispensable. We find the district court did not abuse its discretion in weighing these considerations, and we agree with the district court that TransAm had the same interest as the drivers in challenging the non-compete provision's validity, and "the remaining factors militate[d] against dismissal." <u>United States ex rel. Steele v. Turn Key Gaming, Inc</u>., 135 F.3d 1249, 1252 (8th Cir. 1998).

Nonetheless, TransAm argues the drivers are indispensable parties because only the drivers have standing to challenge the reasonableness of the non-compete

Federal Practice and Procedure § 1609 (3d ed. 2019) ("[B]oth the trial court and the appellate court may take note of the nonjoinder of an indispensable party sua sponte."); <u>see also</u> <u>Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt</u>, 43 F.3d 1491, 1495 n.3 (D.C. Cir. 1995) (finding that even though the defendant did not cross appeal the denial of the motion to dismiss, the appellate court has a duty to raise the indispensable party issue sua sponte).

provision, which prejudices both the drivers and TransAm. We are not persuaded. As explained above, an unreasonable non-compete provision would only make the provision voidable, and a voidable contract supports an intentional interference claim. Thus, there can be no prejudice to TransAm or the drivers by not joining the drivers as parties in this case.

Accordingly, we conclude the district court did not abuse its discretion in finding the drivers were not indispensable parties.

IV.

For the foregoing reasons, we reverse the district court's order granting TransAm's motion for summary judgment and remand for further consideration. Additionally, we affirm the district court's determination that the drivers are not indispensable parties to the proceeding.

STRAS, Circuit Judge, dissenting.

This case is about competition for long-haul truck drivers. CRST recruits drivers by providing a training program and then recoups its costs over the following ten months. TransAm, a direct competitor, finds its drivers through nationwide advertising and then provides training-reimbursement payments. These different business models happened to clash when TransAm recruited some of CRST's drivers before they had completed their ten-month contracts. The court holds that, under Iowa law, TransAm's actions could amount to tortious interference. As may be clear by now, I disagree.

Tortious interference with contract is not about favoring some business models over others. Rather, as Iowa law recognizes, it is about deterring *improper* interference with contracts. *See Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d

-16-

234, 243 (Iowa 2006). One factor matters most in determining whether an alleged tortfeasor has acted improperly: motive. *See, e.g.*, *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 197 (Iowa 1990) ("Motive or purpose determines whether the interference was improper."). To establish an improper motive, CRST had to "identify specific facts" revealing that TransAm was motivated by some "*desire . . . to accomplish the interference.*" *Green*, 713 N.W.2d at 244–45 (emphasis added; citation omitted); *see also Nesler*, 452 N.W.2d at 197–98.

CRST has nothing. There is no evidence that TransAm's recruiting efforts, including its nationwide advertisements, were aimed at anything more nefarious than finding qualified drivers. *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 663 (Iowa 2008) (distinguishing "legitimate business objectives" from "improper purpose[s]"). Without evidence of an improper motive, the wheels come off CRST's tortious-interference claim. *See Green*, 713 N.W.2d at 245 ("If the sole motive is a legitimate purpose derived from the law, then any interference is not improper as a matter of law.").

To be sure, TransAm offered better terms than CRST, whose business model required it to pay drivers less until the company recouped its training costs. Even so, under the Restatement (Second) of Torts, which Iowa has adopted, simply offering better terms is not enough:

> Another method [for A to induce] B to sever his business relations with C is to offer B a better bargain than that which he has with C. . . . A's freedom[, however,] to conduct his business in the usual manner, to advertise his goods, to extol their qualities, to fix their prices and to sell them is not restricted by the fact that B has agreed to buy similar goods from C. *Even though A knows of B's contract with C, he may nevertheless send his regular advertising to B and may solicit business*

*in normal course.* This conduct does not constitute inducement of breach of the contract.[5]

Restatement (Second) of Torts § 766 cmt. m (Am. Law Inst. 1979) (emphasis added); *see also Kern*, 757 N.W.2d at 664 (applying the Restatement).

The bottom line is that TransAm was free, in the Restatement's words, to recruit through its "regular advertising"; "conduct [its] business in the usual manner"; and "extol [the job's] qualities." Restatement (Second) of Torts § 766 cmt. m. It was free to do so even if it knew that some of the drivers might have contracts with CRST. *Id.*; *see ante* at 7–8; *see also* Restatement (Second) of Torts § 766 cmt. n (explaining that it is not tortious for A to enter into an agreement with B, even if A knows that performing their new agreement will require B to breach a preexisting contract with someone else). That is, after all, how the "American system of free enterprise" works. Restatement (Second) of Torts § 768 cmt. a.

It would be one thing if TransAm had sent a targeted communication to CRST drivers offering them a "special" deal for breaking their contracts. *Id.* § 766 cmt. m, illus. 3. If, for example, a competitor were willing to take a financial hit to induce a breach, it would suggest that an improper, "non-business-related motivation" might be at play. *Kern*, 757 N.W.2d at 663.

But what transpired here is different for at least two reasons. First, in its nationwide advertising, TransAm did not specifically target CRST drivers. Second, CRST drivers did not receive a "special" deal. Rather, their deal was actually worse in the sense that they were ineligible for the training-reimbursement payments that

---

[5]Under Iowa law, "inducement" and "improper" interference are technically separate elements. *See Rail Intermodal Specialists, Inc. v. Gen. Elec. Capital Corp.*, 103 F.3d 627, 630 (8th Cir. 1996). Nevertheless, under the circumstances of this case, I agree with the court that they can be analyzed together.

other prospective drivers were offered. *See ante* at 7. Had TransAm's motive been to interfere with CRST's contracts, it would have offered drivers an extra incentive to breach them, not refused to provide them with the same incentives available to others. *See* Restatement (Second) of Torts § 766 cmt. m, illus. 3.

The court appears to agree with me, up to a point. *See ante* at 8 (discussing Restatement (Second) of Torts § 768). Where it takes a detour is the non-compete agreements, which in its view, prohibit competition for employees altogether, targeted or not. *Id.*; *see* Restatement (Second) of Torts § 768 cmt. i. This interpretation of Iowa law, however, puts the cart before the horse.

The mere existence of non-compete agreements does not relieve CRST from proving that TransAm had an improper motive. *See Green*, 713 N.W.2d at 245 (discussing what a plaintiff must show); *see also* Restatement (Second) of Torts § 768 cmt. a ("[T]he fact that the actor is not justified on the basis of competition [alone] is not conclusive of [its] liability. [Its] action may be justified for other reasons."). After all, their existence, standing alone, tells us only about the obligations that CRST and its drivers had to each other. It tells us nothing about TransAm's motives, which means the non-compete agreements are really beside the point. *See* Restatement (Second) of Torts § 768 cmt. h (explaining that even when section 768's competition justification does not apply, a defendant's "interference may be proper because of other circumstances including the fact of competition").

Without evidence of TransAm's improper motive, CRST's unjust-enrichment claim falls apart too. *See Fin. Mktg. Servs., Inc. v. Hawkeye Bank & Tr. of Des Moines*, 588 N.W.2d 450, 460 (Iowa 1999); *see also ante* at 13–14 (explaining that the viability of CRST's unjust-enrichment claim depends on whether its tortious-interference claim survives). CRST could have tried to recover the money it had

-19-

spent on training from the drivers themselves, who were the ones that breached their contracts. But as for its claims against TransAm, summary judgment should have been the end of the road.

Faced with a conflict between two competing business models, tort law does not require us to pick one over the other. And without evidence of an improper motive, the court should not put the brakes on legitimate competition. I respectfully dissent.

_____