MAREE E. SMITH and PHIL MORRIS, appellants, v. HAROLD A. STOWELL, defendant-appellee, JANE BIDDICK, executrix under will of Matt H. Biddick, deceased, appellee.

## No. 51176.

(Reported in 125 N.W.2d 795)

Jᴀɴᴜᴀʀʏ 14, 1964.

Rᴇʜᴇᴀʀɪɴɢ Dᴇɴɪᴇᴅ Mᴀʀᴄʜ 10, 1964.

DeWitt H. Smith, of Marion, for appellants.

Fisher & Pickens, of Cedar Rapids, for defendant-appellee.

GARFIELD, C. J.—This is a controversy over the right to own thirty shares of stock in the First National Bank of Marion, Iowa, issued to defendant Stowell in the summer of 1958 as part of a stock dividend, following a transfer of $150,000 from the bank's surplus of $450,000 to its capital of $50,000. After the transfer, the surplus was $300,000 and the capital $200,000. Three shares of new stock or multiple thereof were issued to each holder of one share of old stock or multiple thereof. (At the direction of the comptroller of the currency the transfer was first from surplus to undivided profits and then to the capital account. We regard this, however, as unimportant.)

Plaintiff Phil Morris held a written option agreement signed by defendant in January 1956, under which Morris was entitled to repurchase ten shares of the stock at $305 a share at any future date that defendant disposed of it. Five of the ten shares originally belonged to plaintiff Maree E. Smith and the other five to plaintiff Matt H. Biddick. The ten shares were sold to defendant at $290 a share about the time the option was signed, as part of an arrangement under which defendant came to the Marion bank from one at Fairfield to act as executive vice-president and cashier—chief executive officer—as well as a director of the Marion bank. Biddick died during pendency of this action and his executrix was substituted as a plaintiff, a circumstance we ignore.

When defendant came to Marion, Morris was assistant cashier there. He was acquainted with defendant and suggested to the board of directors that defendant might be available for the Marion position. For some reason which is unimportant here Mrs. Smith and Biddick sold their stock to Morris to be by him transferred to defendant, taking from Morris an option to repurchase it at $305 a share at any future date that *defendant* disposed of it. Morris in turn took the option agreement from

168

defendant, previously referred to, for the benefit of Mrs. Smith and Biddick. Rights of the parties are the same as if sale of the ten shares had been direct from Mrs. Smith and Biddick to defendant with the option to repurchase running from him to them without the intervention of Morris.

When Morris was in the act of purchasing a majority of the stock in 1961, a move which succeeded, defendant decided he wanted to leave the Marion bank. He did so, according to Morris, about October 1, 1961. Defendant offered to resell to Morris at $305 a share the ten shares acquired by him when he came to Marion. However, the three plaintiffs, Morris, Mrs. Smith and Biddick, insisted they were entitled under the option agreement signed by defendant to his forty shares (the ten shares first acquired and the thirty acquired as a stock dividend) for $3050.

When defendant, who sold the thirty shares for $9000 to a Waterloo banker in August 1961, refused to comply with their demand plaintiffs brought this action in equity September 8, 1961, to have their right to repurchase the forty shares for $3050 established and enforced. Upon the trial Morris and defendant were the principal witnesses. The court held plaintiffs were entitled to repurchase for $3050 only the ten shares first acquired by defendant and that the option agreement did not include the thirty shares acquired by him as a stock dividend in the summer of 1958. Only plaintiffs Morris and Mrs. Smith have appealed.

It is obvious the terms of the option agreement defendant signed are of vital importance. The documents were prepared by Mr. Smith, husband of Maree. He was a stockholder and director in the bank and its attorney. The first paper was a signed offer by Morris, dated January 9, 1956, to purchase from Mrs. Smith and Biddick, accepted by them, ten shares of the stock (five from each) at $290 a share. It provided, "I give you an option to resell to each of you five shares * * * at $305 a share, to be exercised by each of you at any future date that the said Harold A. Stowell * * * make disposition of the ten shares of stock which you will have assigned by delivery to him, * * *."

Defendant then signed an option agreement which quotes the above and other language from the paper Morris signed and

adds this vital provision: "I will fully protect and indemnify you in the performance of your obligation under said option agreement, by not selling *said ten shares of stock assigned to me,* without first granting you *the option to reacquire the same.* at \* \* \* $305 in order that you may in turn reassign *the same* to said [Mrs.] Smith and Biddick under your offer and acceptance agreement of January 9th, 1956" (emphasis added).

■■ I. It is apparent the agreement defendant signed expressly obligates him to reassign to Morris at $305 only the ten shares assigned to defendant. It contains no express agreement that defendant would also assign to Morris any stock the former might acquire as a stock dividend during his ownership of the ten shares. The agreement signed by Morris, accepted by Mrs. Smith and Biddick, also grants them an option to reacquire only "the ten shares of stock which you will have assigned by delivery to him" (defendant).

The paper signed by defendant is even more definite. He agrees therein not to sell *"said ten shares* of stock assigned to me, without first granting you the option to reacquire *the same* at \* \* \* $305 in order that you may in turn reassign *the same* to said [Mrs.] Smith and Biddick under your \* \* \* agreement \* \* \*" (emphasis added).

"Said" is a word of reference and means "before mentioned", "already spoken of", "aforesaid"; it refers to an appropriate antecedent. The expression "the same" also refers to something previously mentioned. Baird v. Johnston, 230 Iowa 161, 164, 297 N.W. 315, 316. See also Holland v. State of Iowa, 253 Iowa 1006, 1011, 115 N.W.2d 161, 164. All such references in these agreements are plainly to the ten shares.

Neither Morris' agreement nor defendant's contains language to indicate any party in interest contemplated more than an option to acquire any stock except the ten shares assigned to defendant. There is no evidence defendant suspected, at the time he paid for the ten shares on January 7, 1956, there might be a stock dividend during his ownership of such shares. (Defendant accepted the Marion bank's offer for him to go there,

"provided the situation is as I understand it", on December 19, 1955.)

There is evidence, however, that Mr. Smith, the attorney who acted for plaintiffs, had some idea on January 10, 1956, there might be a "stock split" in the foreseeable future. He then wrote defendant a letter which included this: "We hope to inaugurate a plan for the reduction of dividends before any stock split, to see if it will not establish a greater movement of the stock, and at lower prices." (Plaintiffs insist the effects of a stock split and stock dividend are the same.) If the option agreement defendant signed were intended to include stock issued as a dividend, the agreement should have so provided.

II. The parties agree this action is for specific performance of the option agreement defendant signed which plaintiffs say they exercised. We think they seek to compel performance of an agreement the parties did not make. Plaintiffs, in effect, ask us to make a contract for them and then enforce it. This we may not do. Precedents in support of this view are numerous, not only our own but those of other states.

Incorporated Town of Wahpeton v. Rocklin, 254 Iowa 948, 954, 119 N.W.2d 880, 884, contains this: "At best, the agreement is uncertain on this point; and uncertainty is a compelling reason for refusing specific performance. * * * 'Contracts, to be specifically enforced, must be so certain and definite in their terms as to leave nothing to conjecture, or to be supplied by the court.'" Several earlier decisions are cited. See also citations in Down v. Coffie, 235 Iowa 152, 157, 158, 15 N.W.2d 216, 219.

Pazawich v. Johnson, 241 Iowa 10, 14, 39 N.W.2d 590, 592, states: "* * * it is also well-settled that specific performance will not be decreed unless the terms of the contract are so expressed that the court can determine with reasonable certainty what is the duty of each party * * *." (Citations)

Fairgrave v. Illinois Bankers Life Assn., 211 Iowa 329, 336, 233 N.W. 714, 717, says: "* * * this court may not change that language and read into the contract other terms, which were not agreed upon at the time of the making of such contract."

From Lockie v. Baker, 206 Iowa 21, 24, 26, 218 N.W. 483, 484, 485: "The minds of the parties must fully meet on the terms of the contract sought to be specifically enforced. [Citation] * * *.

"* * * a court of equity does not undertake to make a contract for the parties or to supply any essentials thereof." See also Marti v. Ludeking, 193 Iowa 500, 502, 503, 185 N.W. 476. Lockie v. Baker and Marti v. Ludeking are among the cases Incorporated Town of Wahpeton v. Rocklin, supra, 254 Iowa 948, 119 N.W.2d 880, 884, cites with approval.

██ 81 C. J. S., Specific Performance, section 35a, pages 494, 495, states: "A contract, in order to be specifically enforceable, * * * must be capable of being performed without adding to its terms * * *. The court cannot supply an important omission or complete a defective contract for the purpose of specific performance."

49 Am. Jur., Specific Performance, section 22, pages 35, 36, contains this: "Whenever it appears that material matters are not clear, certain, and complete, but are left by the parties so obscure or undefined that the court cannot say whether or not the minds of the parties met upon all the essential particulars, * * * the case is not one for specific performance. Equity cannot make a new contract for the parties, but must enforce the contract according to its terms or not at all; the court will not make a contract for the parties or supply any material stipulation thereof."

See also in support of our conclusion the agreement plaintiffs seek to enforce is, at best, too·indefinite to warrant the relief asked: M. F. v. F., Del. Ch., 172 A.2d 274, 276; Henry v. Rouse, 345 Mich. 86, 75 N.W.2d 836, 839; McCarty v. Nelson, 233 Minn. 362, 47 N.W.2d 595, 599; Gettemy v. Homestead Association of Westmoreland, 356 Pa. 475, 52 A.2d 325, 327.

This from 17A C. J. S., Contracts (1963), section 296(3), pages 89–98, is also quite applicable here:

"It is not within the province, function, duty, or power of the court to alter, revise, modify, extend, rewrite, or remake a contract by construction, or to make a new, or different, con-

172

tract for the parties, whether in the guise of construction or otherwise; its duty is confined to the construction or interpretation of the one which they have made for themselves. * * *

"The court may not rewrite the contract for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice, or under the rule of liberal construction, make for the parties a contract which they did not make for themselves, or make for them a better contract than they chose, or saw fit, to make for themselves, or remake a contract, under the guise of construction, because it later appears that a different agreement should have been consummated in the first instance, or in order to meet special circumstances or contingencies against which the parties have not protected themselves.

"Likewise, the court may not alter a contract for the benefit of one party and to the detriment of the other or others, or make a new contract at the instance of one of the parties, or, by a process of interpretation, relieve one of the parties from the terms to which he voluntarily consented, or, because of equitable considerations, obviate objections which might have been foreseen and guarded against, * * *."

III. Plaintiffs state ten propositions relied upon for reversal which fill thirteen pages of their brief. We shall not extend this opinion to discuss each of them. We find no sufficient basis for reversal in any or all of them. No adequate avoidance of the fundamental rules stated in Division II hereof appears. Plaintiffs' first proposition asserts the decree results in unjust enrichment of defendant. Other propositions assert the result of the stock dividend was a mere matter of bookkeeping and that after it was declared defendant owned the same proportion of the total capital as before.

Of course it is true ten shares of stock bear the same ratio to 500 that 40 bear to 2000 and defendant owned one fiftieth of the total stock issued both before and after the dividend was declared. However, we are satisfied plaintiffs are not entitled, on the ground of unjust enrichment, to the decree they seek. It may be conceded, in the light of what has happened

since January 1956, the transaction which brought defendant to the Marion bank proved profitable for him. Yet in going there he merely accepted the proposition offered him and signed the paper prepared for his signature by a spokesman for plaintiffs and the bank. There is no showing defendant was guilty of fraud or other inequitable conduct in the transaction.

Further, the evidence is that during the five years, eight and one-half months defendant was the chief executive officer of the bank its profits after payment of cash dividends about equalled or slightly exceeded $150,000, amount of the stock dividend. We also note plaintiffs' petition alleges the fair and reasonable value of the stock was $350 per share in August 1961. Thus plaintiffs are insisting they are entitled to stock of the value of $14,000 upon payment of $3050, notwithstanding they have no express agreement which so provides.

Gard v. Razanskas, 248 Iowa 1333, 85 N.W.2d 612, 65 A. L. R.2d 982, defines "unjust enrichment." The decision is summarized in Shadle v. Borrusch, 255 Iowa 1122, 1126, 1127, 125 N.W.2d 507, 510, and other definitions of the term are there set out. What is said in the cited opinions need not be repeated here.

"Restitution" and "unjust enrichment" are modern designations for the older doctrine of quasi contracts or contracts implied in law, sometimes called constructive contracts. The doctrine rests upon the equitable principle that one shall not be permitted to unjustly enrich himself at the expense of another or to receive property or benefits without making compensation therefor. City of Pella v. Fowler, 215 Iowa 90, 96, 244 N.W. 734, 737, and citations.

It is also said that substance of the doctrine lies in a promise, implied by law, one will restore to the person entitled thereto that which in equity and good conscience belongs to him. 17 C. J. S., Contracts (1963), section 6, page 571.

Plaintiffs' case is based on an express written agreement which covers the subject matter and fixes the rights of the parties. If plaintiffs are entitled to the thirty shares in controversy it must be by virtue of the terms of the agreement. There

174

is no room for a contract implied in law. One who pleads an express contract, specific as to all its terms, cannot recover upon a contract implied in law. Maasdam v. Estate of Maasdam, 237 Iowa 877, 884, 24 N.W.2d 316, 320, and citations; Lautenbach v. Meredith, 240 Iowa 166, 168, 35 N.W.2d 870, 871.

Although we have held there may be a contract implied in law on a point not covered by an express contract there can be no such implied contract on a point fully covered by an express contract and in direct conflict therewith. Snater v. Walters, 250 Iowa 1189, 1198, 98 N.W.2d 302, 307, 308, and citations. As pointed out in Division I hereof, the written option agreement here covers only the ten shares defendant acquired in January 1956.

The rule as frequently stated is that where there is an express contract covering the subject matter the law will not imply a quasi or constructive contract. Goodman v. Motor Products Corp., 22 Ill. App.2d 378, 161 N.E.2d 31; Schimmelpfennig v. Gaedke, 223 Minn. 542, 27 N.W.2d 416, 420, 421; Williams v. Goodyear Aircraft Corp., 84 Ohio App. 113, 85 N.E.2d 601, 604; Schneider v. Allis-Chalmers Mfg. Co., 196 Wis. 56, 219 N.W. 370, 373, and citations; 17 C. J. S., Contracts (1963), section 6, page 574. See also Hawn v. Malone, 188 Iowa 439, 444, 176 N.W. 393, 395.

Consistent with the above and directly applicable here is this from Comment a, Restatement, Restitution, section 107(1), at page 448: "* * * a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return." Ullman .v. May, 147 Ohio St. 468, 72 N.E.2d 63, 68, applies this principle. See also 17 C. J. S., Contracts, section 6, page 574. Defendant testified he has been ready at all times to transfer the ten shares to plaintiffs at $305 a share. There is no evidence to the contrary.

IV. Plaintiffs argue federal law is controlling since the case involves transfer of stock in a national bank. The contention is without merit.

It appears without dispute the stock dividend had the approval of the comptroller of the currency. So far as shown, no

federal law was violated. No act of congress or decision of a federal court has come to our attention which conflicts with any of the views herein expressed. It is not apparent that the Federal Government or any agency thereof is concerned as to whether plaintiffs or defendant have the right to own the thirty shares in controversy.

"National banks are brought into existence under Federal legislation, are instrumentalities of the Federal government, and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as Federal agencies or conflict with the paramount law of the United States." (Citations) First National Bank in St. Louis v. Missouri, 263 U. S. 640, 656, 44 S. Ct. 213, 215, 68 L. Ed. 486, 492.

The cited case holds a national bank in Missouri was subject to a state statute prohibiting banks from establishing branches. Lewis v. Fidelity & Deposit Co., 292 U. S. 559, 566, 54 S. Ct. 848, 78 L. Ed. 1425, 1431, 92 A. L. R. 794, applies the language just quoted under a different factual situation. Nothing in our decision here interferes with the purposes of the creation of national banks, tends to impair or destroy their efficiency as a federal agency, or conflicts with the paramount law of the United States.

Other contentions have been considered. We think they do not call for discussion.—Affirmed.

All JUSTICES concur.