# IN THE SUPREME COURT OF IOWA

No. 06–1054

Filed November 21, 2008

**GREGORY KERN,**

Appellant,

vs.

**PALMER COLLEGE OF CHIROPRACTIC,
ROBERT PERCUOCO, GUY RIEKEMAN,
and KEVIN MCCARTHY, Individually,**

Appellees.

---

Appeal from the Iowa District Court for Scott County, James E. Kelley, Judge.

A discharged employee challenges summary judgment in favor of the employer on a wrongful termination claim and the employer's agents on intentional-interference-with-contract claims. **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

Jennie L. Clausen of Cartee & Clausen Law Firm, P.C., Davenport, for appellant.

Robert D. Lambert of Bittner, Lambert & Werner, Davenport, for appellees Palmer College of Chiropractic and Robert Percuoco.

Brendan T. Quann and Joshua P. Weidemann of O'Connor & Thomas, P.C., Dubuque, for appellee Guy Riekeman.

Earl A. Payson of Earl A. Payson, P.C., Davenport, for appellee Kevin McCarthy.

**HECHT**, **Justice**.

In this case, a discharged employee sued his former employer for breach of an employment contract, and sued three of the employer's agents for tortious interference with that contract. The district court concluded the termination was, as a matter of law, for cause and granted summary judgment to all of the defendants. We conclude the district court erred in granting summary judgment to the employer and one of the three individual defendants.

### I.     Factual and Procedural Background.

A reasonable fact-finder viewing the summary judgment record in the light most favorable to the plaintiff, Dr. Gregory Kern, could find the following facts. Kern was employed as an assistant professor by Palmer College of Chiropractic. A written contract established the term of his employment from October 1, 1995, to September 30, 2000. The parties fully incorporated, as an "integral and binding part" of the contract, the 1988 Palmer College Faculty Handbook, which stated the terms and conditions of employment for all Palmer College faculty members.

The faculty handbook declared the responsibilities of Palmer faculty members, detailed the internal procedural protections available to any aggrieved faculty member, and prescribed the grounds for termination of faculty members' employment. Section 6.61 of the handbook addressed the grounds for termination:

> Dismissal from appointment may be effected by the College for the following causes:
>
> 1.     Conduct seriously prejudicial to the College through conviction of an infraction of law or through moral turpitude.
>
> 2.     Willful failure to perform the duties of the position to which the faculty member is assigned

or willful performance of duty below accepted standards.

3.  Breach of College regulations adversely affecting the College.

During a faculty meeting attended by Kern on November 30, 1999, Dr. Donald Gran, Kern's immediate supervisor, requested all faculty members draft twenty-five questions suitable for inclusion in the national chiropractic board examination. Gran described the proper formatting for the questions, which were to be returned to Gran in an electronic format. The task of writing such questions was not foreign to the Palmer faculty, but in previous years Kern and several other professors had routinely submitted proposed questions in handwritten form. Gran also requested all faculty members under his supervision, including Kern, draft and submit to him a statement of professional goals for the year 2000. An email from Gran to faculty members provided a model of the format to guide them in developing appropriate goals.[1] In February 2000, Gran reminded the faculty that the proposed national board questions were due in electronic form by March 30.

On March 22, 2000, Gran's secretary, Sharon Boyle, sent an email reminder to several faculty members, including Kern, who had not delivered to Gran their statements of professional goals. The email set a new deadline of March 31 for completion of the task, and reiterated the four criteria for appropriate goals:

1.  List at least one primary goal you will achieve by December 2000 relating to your classroom teaching, research/scholarship, and service to the college.

---

[1]The summary judgment record is unclear whether Kern actually received this and other messages during the spring of 2000 because of problems with the College's email system.

2. For the goals listed, indicate the anticipated administrative and/or collegial support necessary to accomplish the goal.

3. For the goals listed, describe the tangible end product which signifies the goal has been accomplished.

4. For the goals listed, describe the anticipated timeline for any major milestones in accomplishing your goals.

Gran sent additional emails on March 28 and 29 reminding faculty members who had not submitted goals that he expected completion of the task "without fail" on March 31. Kern submitted hand-written national board exam questions and a single goal to Gran sometime between April 1 and April 4. Kern articulated his goal as follows:

1. My primary goal to be achieved by December 2000 is to restore all departments campus wide. These goals carry through to teaching, research/scholarship, and especially service to the college.

2. Anticipated administrative help in this goal is very minimal, anticipated collegial support, i.e. faculty is going to have to be huge.

3. The tangible end product to this goal is clearly better communication, better morale, and much better quality for the students & faculty.

4. My anticipated timeline for this goal is: however long it takes.

(Emphasis in original.) Kern's reference in the statement to the "restoration of all departments" adverted to a decision by Palmer's administration to shift from a departmental curriculum to a "year-based" curriculum in mid-to-late 1999. Kern was dissatisfied with the reorganization of the curriculum and believed it would negatively affect Palmer students. He had openly expressed his doubts about the suitability of the new organizational structure in questions posed to Dr. Guy Riekeman, the president of the college, during a meeting of

Palmer's faculty senate in the spring of 2000. Dr. Riekeman responded that anyone who disagreed with the reorganization could choose to leave.

Kern perceived a negative response from Palmer's administrators after that meeting of the faculty senate. One of Kern's patients was an acquaintance of Dr. Robert Percuoco, Palmer's Dean of Academic Affairs.[2] The patient carried a message to Kern for Percuoco, advising Kern to "watch his back" and informing Kern that his days at Palmer were numbered because Percuoco would "see him fired."[3]

Soon thereafter, Gran, who was supervised by Percuoco, confronted Kern and placed a record in his personnel file warning against excessive use of sick days. Kern was alarmed by this action as he had used fewer sick days than the faculty handbook authorized for that year. Gran also took issue with the substance of Kern's stated goal, and returned to Kern his proposed national board questions because they were not properly formatted. In an April 7 email requesting that Kern re-submit the questions electronically that day, Gran advised Kern to contact Sharon Boyle for assistance with the formatting if assistance was needed. Kern testified at his deposition that he accepted the offer of assistance and turned his questions into Boyle for formatting on more

---

[2]Faculty members were permitted to engage in the practice of chiropractic during the term of their employment with Palmer.

[3]Iowa Rule of Civil Procedure 1.981(5) provides "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The record contains no affidavit or sworn testimony from the patient-declarant as to her alleged conversations with Percuoco. The only evidence of Percuoco's statements in the summary judgment record is Kern's double hearsay account of them. Although the admissibility of these hearsay statements at trial is subject to question, Percuoco did not contend in the district court, and does not contend on appeal, that the statements should be disregarded under rule 1.981(5). On the contrary, he conceded during the hearing on the summary judgment that the district court should consider the statements attributed to Percuoco in the light most favorable to Kern. We therefore consider them part of the summary judgment record on appeal as well.

than one occasion after receiving notice of the electronic format requirement. On April 10, Gran sent a memorandum of reprimand to Kern stating properly formatted exam questions had not been received. Kern viewed Gran's responses as harassment because he knew other professors who were not computer-literate had submitted proposed questions in handwriting and were accommodated with secretarial assistance, and those professors were not reprimanded.

On April 13, 2000, Kern met with Gran and Dr. Kevin McCarthy, the Vice President of Academic Affairs for Palmer College. McCarthy angrily confronted Kern about the substance of Kern's goal to return to the former curriculum structure. Kern felt physically threatened by McCarthy's demeanor during the meeting. Although various email messages sent to Kern after the meeting suggest McCarthy and Gran expected Kern would prepare a new statement of goals, Kern asserted in his deposition testimony that McCarthy expressly told him during the meeting a new statement of goals would not be required.

Kern did not submit a new statement of goals after the April 13 meeting. After several subsequent email messages from college administrators to Kern inquiring about the status of his proposed exam questions and his goals, McCarthy sent a written ultimatum to Kern directing him to submit both to Gran by noon on June 14, 2000, or suffer dismissal. McCarthy sent copies of this ultimatum to Riekeman, Percuoco, and Gran.

On June 14, a few minutes before the noon deadline, Kern submitted to Gran a handwritten group of proposed national board exam questions and a note. The message on the note reminded Gran that Kern had previously submitted his statement of goals, and offered to provide Gran another copy if Gran had misplaced it. On June 19,

McCarthy sent Kern a letter dismissing him from employment for "willful failure to perform the duties of the position to which the faculty member is assigned and/or willful performance of duty below accepted standards."

Kern appealed his dismissal to the faculty judiciary committee as authorized in the faculty handbook. A grievance hearing was held on August 29, 2000, before the committee consisting of eight members. Following the hearing during which both Kern and McCarthy testified, the faculty judiciary committee issued its recommendation to Riekeman on September 1, 2000. Addressing only the college's claim that Kern's discharge was justified by his failure to timely submit satisfactory professional goals in a proper format, the committee found that the "totality of evidence presented during the hearing, in the opinion of the committee, did not provide clear and convincing basis to justify the rationale indicated in the letter of dismissal. . . ." The committee therefore found meritorious Kern's appeal of the grievance and recommended his dismissal from the faculty be rescinded. President Riekeman disagreed with the committee's recommendation, and issued a written decision on October 9, in which he found Kern's employment was properly terminated for violation of section 6.6 of the Faculty Handbook.

Kern subsequently filed this action alleging breach of contract by Palmer College and intentional interference with contractual relations by Percuoco, Riekeman, and McCarthy. All of the defendants moved for summary judgment. Palmer's motion asserted Kern had failed to raise a genuine issue of material fact on his breach-of-contract claim. The motions of the other defendants contended generally that Kern had failed to generate a fact question in support of his allegation that the defendants wrongfully interfered with his employment contract. The

court granted Palmer's motion for summary judgment, finding as a matter of law Palmer had not breached the employment contract. The court also granted summary judgment in favor of Reikeman, McCarthy, and Percuoco, concluding as a matter of law Kern had failed to engender a fact question on his claim that one or more of the individual defendants caused Palmer to breach the contract.

**II.    Scope of Review.**

We review a district court's summary judgment ruling for errors at law. *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000). A party is entitled to summary judgment when the record shows no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Iowa R. Civ. P. 1.981(3). The court views the record in the light most favorable to the nonmoving party. *Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005) (citation omitted). "In deciding whether there is a genuine issue of material fact, the court . . . afford[s] the nonmoving party every legitimate inference the record will bear." *Id.*

**III.    Discussion.**

**A.    Summary Judgment in Favor of Palmer College.** To prevail in his claim for breach of contract against Palmer, Kern must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [he] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). The fighting issues in this case at the summary judgment stage relate to the third and fourth elements of the

cause of action: the allegations of performance by Kern and breach by Palmer.

When engaging in the construction of contracts we look to the parties' intent, as indicated by the terms of the contract. Iowa R. App. P. 6.14(6)(*n*). The question of whether the plaintiff has proved a breach of contract is for the judicial fact-finder. *See Davenport Bank & Trust Co. v. State Cent. Bank,* 485 N.W.2d 476, 480 (Iowa 1992) ("The existence and terms of a contract and whether the contract was breached are ordinarily questions for the jury.").

The parties in this case concur that Kern's employment contract is a "for cause" contract.[4] Generally an employee under such an agreement may be terminated for reasons that relate to "performance of his or her job and the impact of that performance on an employer's ability to attain its reasonable goals." *Lockhart v. Cedar Rapids Comm. Sch. Dist.,* 577 N.W.2d 845, 847 n.1 (Iowa 1998) (citing *Briggs v. Bd. of Dirs.,* 282 N.W.2d 740, 743 (Iowa 1979)). "Cause" does not include "reasons which are arbitrary, unfair, or generated out of some petty vendetta." *Id.* Rather than agreeing to a general "for cause" termination term, the parties to this contract included a specific enumeration of what would constitute a valid termination "for cause." The contract provided Kern could be terminated for "[w]illful failure to perform the duties of the position to which [he] [wa]s assigned or willful performance of duty below accepted standards."[5] Summary judgment in favor of Palmer is

---

[4]Courts variously refer to "for cause" contracts as "just cause," "for cause," "good cause," or "proper cause" contracts. We consider these appellations interchangeable. *See Lockhart v. Cedar Rapids Comm. Sch. Dist.*, 577 N.W.2d 845, 846–47 (Iowa 1998).

[5]As noted above, the contract also defined "good cause" to include "conduct seriously prejudicial to the College through conviction of an infraction of law or through moral turpitude" and "breach of College regulations adversely affecting the College." As these alternative definitions of "good cause" were not relied on by Palmer as a

inappropriate, then, if there is a genuine issue of material fact regarding whether Kern's conduct amounted to a "willful failure to perform" his duties as an assistant professor, or whether his performance of those duties fell "below accepted standards."

In this case, Palmer concluded cause existed for the termination of Kern's employment. Palmer contends, and the district court concluded, judicial review of the employer's finding of cause for termination should be constrained by deference for the employer's decision. Kern responds that employers have no legitimate claim to such deference because judicial fact-finders are perfectly capable of making factual determinations as to whether the parties' contractual formulation of causes for termination has been breached, much as they are trusted to sort out whether a failure of performance has occurred in other contract litigation.

A majority of courts addressing the standard by which performance of employment contracts is judged view employment contracts as fundamentally different from other contracts, and consequently grant employers great deference in making "cause" termination decisions. *See, e.g.*, *Braun v. Alaska Commercial Fishing & Agric. Bank*, 816 P.2d 140, 142 (Alaska 1991); *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 948 P.2d 412, 420–22 (Cal. 1998); *Towson Univ. v. Conte*, 862 A.2d 941, 950–51 (Md. 2004); *Southwest Gas Corp. v. Vargas*, 901 P.2d 693, 701 (Nev. 1995); *Kestenbaum v. Pennzoil Co.*, 766 P.2d 280, 287 (N.M. 1988); *Thompson v. Associated Potato Growers*, 610 N.W.2d 53, 59–60 (N.D. 2000); *Simpson v. W. Graphics Corp.*, 643 P.2d 1276, 1279 (Or. 1982); *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d

justification for the termination of Kern's employment, we do not discuss them further in this opinion.

298, 304 (Wash. 1989). In *Towson University*, for example, the court concluded "the practical considerations of running a business overwhelmingly favor a legal presumption that an employer retain the fact-finding prerogative underlying the decision to terminate employment." 862 A.2d at 953. In jurisdictions following this rule of deference to employers' termination decisions, the judicial fact-finder's role is not to determine whether the facts underlying the employer's "cause" determination were actually true, or to conduct de novo review of whether the facts found by the employer amounted to "cause" for termination under the terms of the contract. Instead, the judicial fact-finder determines only whether the cause claimed by the employer for termination was "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power," based on facts "supported by substantial evidence and reasonably believed by the employer to be true," and "not for any arbitrary, capricious, or illegal reason." *Baldwin*, 769 P.2d at 304. This approach is generally described as judicial review for "objective reasonableness." *Towson Univ.*, 862 A.2d at 954. To avoid summary judgment under the objective reasonableness standard, a plaintiff who challenges an employer's determination of cause for a discharge must show the employer had no reasonable grounds to believe sufficient cause existed to justify the termination. *Kestenbaum*, 766 P.2d at 287.

The Michigan Supreme Court has adopted a different rule that provides greater protection to employees who have secured "for cause" terms in their employment contracts. In *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980), the Michigan Supreme Court held the question of whether "cause" for termination actually existed was for the fact-finder to decide. 292 N.W.2d at 895 ("[W]here an

employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review. The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work."). The *Toussaint* court expressly rejected the narrower role of the judicial fact-finder prevailing in the jurisdictions that review the reasonableness of an employer's termination decision:

> [W]e have considered and rejected the alternative of instructing the jury that it may not find a breach if it finds the employer's decision to discharge the employee was not unreasonable under the circumstances.
>
> Such an instruction would transform a good-cause contract into a satisfaction contract. The employer may discharge under a satisfaction contract as long as he is in good faith dissatisfied with the employee's performance or behavior. The instruction under consideration would permit the employer to discharge as long as his dissatisfaction (cause) is not unreasonable. The difference is minute.
>
> Where the employee has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or to not be unreasonable. An instruction which permits the jury to review only for reasonableness inadequately enforces that promise.

*Id.* at 896. The court also rejected the employer's argument that "enforcing contracts requiring cause for discharge will lead to employee incompetence and inefficiency," noting employers (1) are not required to enter "for cause" contracts, and (2) are permitted to contract for standards of job performance. *Id.* at 896–97.

We conclude the *Touissant* rule should be applied under the circumstances of this case. Our decision is strongly influenced by the fact that Palmer and Kern defined the concept of "good cause" in their employment agreement. The contract language thus established a standard that is sufficiently definite to allow a fact-finder to determine

whether Palmer had "good cause" to support the termination of Kern's employment. We believe the existence of the specific contractual standard diminishes the force of Palmer's assertions that it should have the right to determine what is or is not "good cause," and that no fact-finder should be permitted to substitute its judgment for the employer's on that question. Where, as here, the parties have adopted a specific standard for the determination of "good cause," we believe the *Touissant* rule strikes an appropriate balance between the employer's strong interest in making employment decisions, and the employee's substantial interest in the employment security and stability offered by contracts which may not be terminated at will, but only for specified "good cause." Notwithstanding the policy arguments advanced by courts according deference to the employer's prerogative, we conclude employment contracts like the one at issue in this case providing specific definitions of "good cause" are not so different from other contracts as to justify a legal construct favoring the employer's interests over those of employees.[6]

Palmer contended, and the district court determined, that the application of the objective reasonableness standard would be most appropriate in this case because (1) Kern was given an opportunity for a hearing before the faculty senate to challenge the termination, and (2) the contract reflects the parties' intent to maintain the employer's prerogative to make employment decisions with only circumscribed judicial review. We disagree. The parties did not expressly contract as to the prospect of judicial review of breach-of-contract claims and the hearing before the faculty judiciary committee was not an apparent

---

[6]We leave for another day the decision of whether the *Towson* rule granting greater deference to the employer's determination of "good cause" should apply where the employment contract fails to define the standard to be applied by the fact-finder.

substitute for judicial review. The faculty senate's decision on the merits of Kern's grievance carried no force because Palmer's administration was not bound under the contract to give it any weight. As it constituted only a recommendation to Riekeman, the hearing process provided only illusory security to Kern. Under the circumstances, we reject the notion that the parties viewed the review by the faculty judiciary committee as a legitimate substitute for the standard of judicial review which is the norm in other contract litigation. Accordingly, the hearing process and Riekeman's review of McCarthy's decision do not support Palmer's claim that an "objective reasonableness" standard of judicial review is appropriate in this case.

Having concluded the district court erred in applying the "objective reasonableness" standard in ruling on Palmer's motion for summary judgment we next consider whether the evidence in the record is sufficient to sustain the summary judgment in favor of Palmer under the *Toussaint* rule. We conclude it is not.

The evidence presented by Palmer suggests despite several requests that he do so, Kern willfully failed to submit properly formatted national board questions. Kern testified after his proposed questions were returned to him, he re-submitted them directly to Palmer's secretarial staff for conversion to electronic format, but the handwritten questions were again returned to Kern. Kern offered testimony in the summary judgment record tending to prove he knew other faculty members had submitted their proposed questions in handwritten form, received secretarial assistance for formatting, and were not disciplined for doing so. On this record, Kern has engendered a fact question as to whether he willfully failed to perform his duty to submit proposed

national board questions, or willfully performed that duty below accepted standards.

We also conclude a fact question exists as to whether Kern willfully failed to comply with his duty to submit goals. At the summary judgment stage we must credit Kern's testimony that McCarthy told him during the April 13 meeting he need not submit a new goal. Although this claim is disputed by Palmer, we believe a fact question exists as to whether McCarthy gave such assurance to Kern. Assuming, as we must at the summary judgment stage, such assurance was given by McCarthy, we conclude a genuine issue of material fact exists as to whether Kern's failure to submit a new goal constituted a willful failure to perform his duty.

Other evidence in the summary judgment record supports our determination that a fact question exists on the questions of whether Kern willfully failed to perform his duties or willfully performed his duties below accepted standards. The faculty judiciary committee determined Kern's alleged misconduct did not rise to the level of an offense that would support termination under the faculty handbook. Additionally, Dr. Glenn Sorgenfrey, a Palmer faculty member, opined in an affidavit that other faculty members would not be fired for conduct such as Kern's. It is of course not the court's role at the summary judgment stage to weigh such evidence against the countervailing evidence in the record. When viewed in the light most favorable to Kern, the faculty judiciary committee's non-binding determination and Dr. Sorgenfrey's affidavit offer some factual support for Kern's claim he did not willfully fail to perform his duties or willfully perform his duties below accepted standards. Accordingly, we reverse the summary judgment on Kern's contract claim against Palmer.

**B.    Liability of Defendants Riekeman, McCarthy, and Percuoco.**    As we have already noted, the district court granted summary judgment in favor of Riekeman, McCarthy, and Percuoco after concluding, as a matter of law, Palmer established the absence of a fact question as to whether Palmer breached its employment contract with Kern.    The court reasoned that because, as a matter of law, Palmer committed no breach of Kern's employment contract, the individual defendants could have no liability for tortiously causing Palmer to breach that contract.    Having concluded the district court erred in granting summary judgment in favor of Palmer, we next consider whether the summary judgment record can sustain the summary judgment in favor of the individual defendants.

At the summary judgment stage, we must determine whether the record includes evidence from which a rational jury could find intentional and improper interference.    *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006).    Although the district court did not determine whether any of the individual defendants' alleged actions were improper, we may affirm the summary judgment ruling on a proper ground urged below but not relied upon by the district court.    *DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002).

To recover for intentional interference with an existing contract, a plaintiff must show:

> (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Green*, 713 N.W.2d at 243 (quotations omitted).    There is no dispute that Riekeman and McCarthy knew of Kern's contract and that they

intentionally caused Palmer to breach the contract. The controversy in this case centers on whether the defendants' alleged intentional interference with Kern's contract was "improper." We look to the following factors in deciding whether the defendants' conduct was improper:

> "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

*Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.,* 481 N.W.2d 510, 518 (Iowa 1992) (quoting Restatement (Second) of Torts § 767 (1981)). The determination of whether the individual defendants' actions in relation to Kern's employment were improper turns primarily on the nature of their conduct, their motives, and a balancing of the respective interests of the parties.

1. *Defendant Riekeman.* Riekeman's role as Palmer's President was to make the final decision as to whether Kern's employment should be terminated. Riekeman reviewed McCarthy's decision to terminate Kern's employment, considered the faculty judiciary committee's recommendation against termination, and made the final decision for the institution he was hired to lead. These actions by Riekeman fall comfortably within the range of usual and customary conduct expected of an employer's chief executive officer under the circumstances of this case.

Kern claims, however, that summary judgment was improper in this case because Riekeman's termination decision was motivated by improper personal animus and therefore constituted improper

interference. Kern supports this claim by reference to a statement made by Riekeman during a meeting with faculty members. When Kern challenged the wisdom of the revised curriculum during that meeting, Riekeman bluntly stated that anyone who opposed the reorganized curriculum could leave. Kern claims this statement evidenced Riekeman's motivation to rid the faculty of an employee who opposed Palmer's new curriculum structure. Although Riekeman's statement, when viewed in the light most favorable to Kern, suggests Riekeman exhibited on that occasion a rather authoritarian management style, it fails, as a matter of law, to raise a genuine issue of fact on the question of whether Riekeman's decision to terminate Kern's employment was a product of an improper motive. Even if we assume at this summary judgment stage Riekeman's sole motive in terminating Kern's employment was to eliminate from the faculty one who had openly and consistently opposed the Palmer administration's curriculum choices, such a motive does not rise to the level of impropriety sufficient to support Kern's intentional tort claim under the circumstances presented here. A manager's motivation to maintain the employment of employees who further the employer's organizational objectives, and to terminate the employment of employees who inflexibly oppose those objectives, is not improper. The motive of a business manager who terminates the employment of an employee in the latter category solely for the purpose of advancing the employer's legitimate business objectives is not motivated by an improper purpose. *Green*, 713 N.W.2d at 245 (stating that "[i]f the sole motive is a legitimate purpose derived from the law, then any interference is not improper as a matter of law"). Kern has failed to proffer, and the record does not disclose, any personal, non-

business-related motivation for Riekeman's actions that could reasonably be viewed as improper.

Kern's interest in continued employment is, of course, substantial, as is Riekeman's interest in carrying out the business functions of Palmer's President. Having carefully considered the social interest in protecting Riekeman's ability to execute Palmer's management objectives and Kern's contract interest in continued employment, Riekeman's direct personal involvement in the termination of Kern's employment, and the relations between the parties, we conclude the district court did not err in granting summary judgment in favor of Riekeman. Finding no evidence in the record tending to prove Riekeman's conduct or motive were improper, we conclude Kern has failed to generate a fact question as to whether Riekeman improperly interfered with Kern's contract. We therefore affirm the summary judgment in favor of defendant Riekeman.

2. *Defendant McCarthy.* We next consider whether the district court erred in granting summary judgment in favor of defendant McCarthy, Palmer's Vice President of Academic Affairs. Like Riekeman, McCarthy had managerial responsibility over Kern and was intimately involved in the termination of Kern's employment. McCarthy contends a reasonable fact-finder could only conclude his conduct fell within the range of proper managerial conduct when he decided to effect the termination of the employment of an employee who repeatedly refused to comply with simple requests and clear directives. We disagree. Viewing the evidence in the light most favorable to Kern, we believe a fact-finder could determine McCarthy represented to Kern during the April 13 meeting that Kern need not submit new goals, and Kern relied upon this representation in failing to submit new goals. Contrary to his alleged representations at the April 13 meeting, however, McCarthy fired Kern in

part because he failed to submit new goals after that meeting. Accepting this version of the facts as true as we must at the summary judgment stage, we conclude a reasonable fact-finder could determine McCarthy fraudulently induced Kern to engage in a course of conduct which would eventually result in the termination of his employment contract. Interference achieved through conduct that is dishonest, fraudulent, malicious, or otherwise wrongful will support a finding that the interference is improper. *See* Restatement (Second) of Torts § 766 cmts. *j, r, s.* We conclude Kern has raised a genuine issue of fact as to whether McCarthy's conduct was dishonest, clearly outside the bounds of proper managerial conduct, and therefore "improper" under section 767.

Kern further asserts the summary judgment record, when viewed in the light most favorable to him, includes evidence tending to prove McCarthy had an improper motive for his conduct. Characterizing McCarthy's anger during the April 13 meeting as sufficient to put him in fear of an act of physical aggression, Kern contends a reasonable fact-finder could determine McCarthy's alleged misrepresentation and his decision to terminate Kern's employment were motivated by personal animus and therefore "improper" under section 767. "Satisfying one's spite or ill will is not an adequate basis to justify an interference and keep it from being improper." *Id.* § 766 cmt. *r; see also id.* § 767 cmt. *d* ("A motive to injure another or to vent one's ill will on him serves no socially useful purpose."). And as we have noted, the termination of an employee's employment for "reasons which are arbitrary, unfair, or generated out of some petty vendetta" advances no legitimate goal of a corporation. *Lockhart,* 577 N.W.2d at 847 n.1. We conclude Kern has produced minimally sufficient evidence that McCarthy improperly

interfered with Kern's contract so as to preclude summary judgment on this claim.

3. *Defendant Percuoco.* We next consider whether the district court erred in granting summary judgment in favor of defendant Percuoco, Palmer's Dean of Academic Affairs. Unlike defendants Riekeman and McCarthy, Percuoco does not contend he is shielded from liability because his conduct and motive in connection with Kern's termination were proper. Percuoco instead contends Kern has produced insufficient evidence to support a claim that Percuoco's conduct played a causative role in Kern's termination.

It is Kern's burden to prove Percuoco intentionally and improperly interfered with the contract. Restatement (Second) Torts § 766 cmt. *o* (noting question of whether the defendant's conduct caused a breach of contract is a question of fact). Viewed in the light most favorable to Kern, the record shows Percuoco vaguely proclaimed to members of his church congregation several months before Kern was terminated that he was "battling evil at Palmer." Percuoco asked his fellow parishioners to pray for strength that he might "do acts he found distasteful." He also told a fellow parishioner that Dr. Kern "better watch his step because troublemakers g[e]t their just rewards," stated that Kern's days were numbered at Palmer, and vowed to "see [Kern] fired."

While this evidence certainly evidences Percuoco's motivation to cause the termination of Kern's employment, and could be reasonably understood as evidence of Percuoco's personal animus toward Kern, these statements alone cannot suffice to generate a genuine issue of fact on Kern's intentional interference claim. The record is devoid of evidence of any conduct by Percuoco in furtherance of any improper motive leading to Kern's termination. Kern presented no evidence tending to

prove Percuoco communicated to Riekeman or McCarthy his desire to see Kern fired, or that Percuoco otherwise influenced or attempted to influence McCarthy or Riekeman to cause Kern's termination. In the absence of evidence tending to prove Percuoco engaged in some conduct calculated to effect Kern's discharge, we must conclude the district court correctly granted summary judgment in Percuoco's favor.

## IV. Conclusion.

Having found genuine issues of fact remain for trial on Kern's contract claim, we reverse the summary judgment in favor of Palmer. We affirm the district court's grant of summary judgment in favor of defendants Riekeman and Percuoco. We reverse the summary judgment granted in favor of defendant McCarthy, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

All justices concur except Cady, Wiggins, and Appel, JJ., who specially concur separately, and Baker, J., who takes no part.

**CADY, Justice (special concurrence).**

I concur in the result reached by the majority because I agree a jury question is presented in this wrongful termination lawsuit to warrant a trial. I disagree, however, with the minority rule adopted by the majority to govern the resolution of the trial.

I believe the majority incorrectly adopted the *Touissant* rule by failing to engage in a proper construction of the employment contract. The majority does not consider the intent of the parties as evidenced by the context surrounding the contract, but, instead, essentially decides the legal effect of the contract as a matter of policy. As a result, the majority misconstrues the jury question engendered by the contract entered into by the parties. The approach taken by the majority will allow the jury in wrongful-termination lawsuits involving specific or good-cause employment contracts to revisit an employer's decision to terminate the employee and to make that decision anew based on the jury's own assessment of the surrounding facts and circumstances. I believe this approach risks ignoring the intent of employers and employees, unduly interferes with the decision-making that takes place within the broader environment of the management of a business, and will ultimately drive specific-cause or good-cause termination provisions from employee handbooks and cause employers to return to the world of at-will employment. The approach taken by the majority is a turn in the wrong direction for employees and employers and, in particular, strips employers of an aspect of discretion essential to the operation of a business.

A brief review of the claim is necessary to clearly identify the important issue at stake in this case. The college provided its faculty

with a handbook that identified the grounds for termination of employment, including "willful failure to perform [assigned] duties" or "willful performance of duty below accepted standards." Kern was discharged by his employer under these grounds and brought a wrongful-termination action based on breach of contract. This lawsuit presented the issue of whether Kern's performance qualifies as grounds for termination as described in the handbook. Kern claimed the conduct relied upon by the college to terminate him did not amount to the grounds for termination identified in the handbook. The college, on the other hand, claimed it was reasonably justified in determining the specified grounds for termination exist. In concluding the lawsuit presented a jury question, the majority has determined the jury should decide at trial if the grounds for termination exist.

Unlike the majority, I would not conclude the jury should decide at trial if Kern's conduct, as shown by the evidence presented by the parties at trial, constitutes the grounds for termination. I believe the jury should decide the facts of the case, but the question of fact it should decide is whether the employer was reasonable in deciding the employee's conduct amounted to the grounds of termination. This important distinction is necessary to effectuate the intent of employers and employees. I find it inconceivable that any reasonable employee or employer would expect a jury to decide the ultimate fact of whether cause existed, independent of the judgment and authority first exercised by the employer.

Ultimately, the question of whether the employer contracted away the authority to decide when cause exists to another arbiter must be derived from our construction of the contract at issue. Of course, the language of the handbook does not provide any specific guidance. Nevertheless, in construing contracts, we seek to carry out the intent of

the parties. Iowa R. App. P. 6.14(n) ("In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says.").

In considering what the parties to this employment relationship intended, it is important to recognize that the specific-termination clause clearly required the employer to the make the decision, along with myriad other business decisions employers must make from day to day. There is no indication the parties believed the employer would make the specific-cause decision under standards different from the hundreds of other decisions made by an employer in the course of operating the business.

Additionally, the dramatic difference between the two standards at issue supports an intention that a reasonable-employer standard be used. Business decisions—such as the decision to hire or fire an employee—are made in the real world. *Towson Univ. v. Conte*, 862 A.2d 941, 953 (Md. 2004). As such, these decisions commonly rely on hearsay, past conduct, personal credibility, "and other facts the judicial process ignores." *Id.* By giving the jury the task of deciding whether specific cause exists in this case, the *Touissant* rule effectively forecloses employers from relying on these common sources. Nothing about the decision to enter into a specific-cause employment contract suggests the parties intended the employer would be required to make the decision without these common sources of information. By adopting the *Touissant* standard, the majority has effectively concluded that is exactly what the parties intended. *See Waters v. Churchill*, 511 U.S. 661, 667, 114 S. Ct. 1878, 1889, 128 L. Ed. 2d 686, 700 (1994) (choosing the

majority standard in a wrongful-termination case with First Amendment implications).

The majority relies on the parties' definition of "good cause" in the employment agreement—establishing a standard a judicial fact finder can reference to determine whether good cause existed—to conclude we should adopt the *Touissant* standard in order to appropriately "balance" the parties' interests. This argument ignores the reality that a definition of good cause and who decides whether good cause exists, as defined, are distinct questions. Additionally, when the issue is viewed as one of contract construction instead of as a question of policy, it is clear the parties' definition of good cause militates against application of the *Touissant* standard here. Where good cause is defined in the employment contract, the employee is protected against the caprice of the employer by that definiteness. It simply does not follow that, where the contract gives greater protection to the employee in the first instance, the parties also intended the employee receive the additional protection of allowing the jury to decide anew whether good cause existed.

I otherwise concur with the majority's disposition of the claims against the individual defendants.

#02/06–1054, *Kern v. Palmer Coll.*

**WIGGINS, Justice (special concurrence).**

I join in the majority opinion and concur with the views expressed by Justice Appel in his special concurrence.

**APPEL, Justice (special concurrence).**

I concur with the thrust of the majority opinion in this case. I respectfully write separately to put the issues raised in this case in a fuller context.

This case presents a simple contractual dispute. Since time immemorial, the law of contracts provides that parties are entitled to bargain freely and that their agreements will be enforced in a court of law. Subject to narrow exceptions, such as cases where contractual terms violate fundamental public policy or are unconscionable, courts do not modify the terms of the contract or use judicial creativity to supply terms that are absent from the written agreement. Courts generally enforce contracts as written, plain and simple.

In this way, the parties themselves are allowed to structure their legal relationships as they see fit, not as the court might wish. Those with a philosophical bent will recognize the notion of individual liberty which inheres in our contract law. Our contract law is designed to empower parties, not discipline them, and to promote transparency and individual choice, not impose the social policy preferences of judges.

In this case, the contract agreed upon by the parties does not simply provide that Kern could be terminated for "just cause," an admittedly amorphous term, but instead establishes detailed and demanding standards for termination. The contract also simply does not contain any language stating or even implying that termination decisions made by the employer are subject to some kind of deferential review when an employee claims that the contract has been breached. If the words of a contract are to have any meaning, such silence is a barrier,

and not a springboard, for insertion by a court of new, unstated contractual terms.

Indeed, if anything were to be implied from the language that the parties did choose to include, it would be that the parties agreed that the burden on Palmer in terminating a faculty member was heavy and that any such decision was not to be cloaked with some kind of broad deference.

Of course, any employer may seek to include in its contract with an employee language that any employer decision related to termination is valid if it is "objectively reasonable." It is undisputed, however, that no such term appears in *this* contract. In my view, that is the end of the matter. The contract should be enforced as any other contract, with fact finding made by the court or jury.

Any approach to this case that would imply deference to an employer's decision to terminate an employee invents a round term that the parties chose not to include and seeks to force it into a square contract. It also proposes to do too much. Because the rule of law announced in this case has general applicability, an approach which implies deference to the employer's termination decision would create by judicial fiat a framework where employer terminations, much like the actions of a state government agency under the Iowa Administrative Procedures Act, are subject to only limited judicial review.

I regard this approach as an act of social engineering. The unstated premise of the implied employer deference approach is that, as a matter of social policy, employers are entitled to a wide berth in making decisions whether or not to retain employees. A further unstated premise is that if the parties do not choose to embrace this premise in their contract, the court should ensure that the parties do so through the

addition of an extraneous contractual term, even though the parties established detailed and specific termination provisions and chose not to incorporate employer deference in it.

The implied employer-deference position is rich in irony. This court has steadfastly refused to imply a duty of good faith and fair dealing in employment relationships. *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 204 (Iowa 1997); *French v. Foods, Inc.*, 495 N.W.2d 768, 771 (Iowa 1993); *Fogel v. Trustees of Iowa Coll.*, 446 N.W.2d 451, 456–57 (Iowa 1989). The theory of these cases is that if the parties desire to impose such a duty, it must be specifically provided in contractual terms by the parties themselves, not by judicial implication. In this case, however, the implied-employer-deference approach would create what amounts to a cousin of the doctrine of good faith and fair dealing that protects the employer, even though there are no contractual terms that remotely support such an implication. Thus, the duty of good faith cannot be used as a sword by a potential plaintiff, but its cousin—implied employer deference to reasonable decisions made by the employer—may be used as a shield by an employer. This would be an unbalanced legal development.

It is, of course, highly debatable whether the implied deference to employer termination decisions is the best social policy, particularly in light of an employee's interest in job security in our modern society. Indeed, if judicial thumbs are to be placed on the scale of justice in employment disputes, an argument could be made that, like insurance contracts, the thumb should be placed on the side of the employee, not the employer. In many employment situations, the employer has disproportionate bargaining power. In these cases, the argument could

be made that employment contracts should be construed against the employer because of the realities of the modern workplace.

I also find it difficult to accept that it is somehow in the employee's interest that the employer be given greater leeway in making termination decisions beyond the express provisions of the contract, thus decreasing the employee's job security. It is inconceivable to me that a prospective teacher joining the faculty at Palmer intended that such an unexpressed term of deference to an employer's termination decision would be implied into the contract for his or her own good.

In my view, instead of implying some kind of employer deference, our judicial thumbs should remain hooked through our belt loops as we impartially review employment cases. Employment relationships are rich and varied and simply defy convenient categorization. Rather than imposing some grand view tending to favor employers or employees, I believe the best course is to adopt a neutral policy toward the interpretation of employment contracts and simply enforce them by their agreed upon terms.

In addition, if we were to accept the implied-employer-deference approach, one would wonder what type of contracts would be next in line for special rules. In the end, instead of a unified theory of contracts, we could end up with a hefty compendium of special contract rules requiring lawyers to make Justinian distinctions that impede private choice, undermine the stability of contracts, and burden clients and their lawyers. Legal developments in the last hundred years have moved in exactly the opposite direction as artificial doctrinal distinctions have fallen by the wayside in favor of more generally applicable legal reasoning.

Moreover, the views expressed here are not reserved for contractual purists intoxicated by normative legal theory. Many courts have accepted the views expressed in this and the majority opinion. The leading case, of course, is *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880, 896 (Mich. 1980). Courts in Nebraska, New Jersey, Ohio, South Dakota, and Vermont have also responded to the principles expressed here and in *Toussaint*, some of them with considerable enthusiasm. *See Stiles v. Skylark Meats, Inc.*, 438 N.W.2d 494, 497 (Neb. 1989); *Witkowski v. Thomas J. Lipton, Inc.*, 643 A.2d 546, 553–54 (N.J. 1994); *Sowards v. Norbar, Inc.*, 605 N.E.2d 468, 473 (Ohio Ct. App. 1992); *Vetter v. Cam Wal Elec. Co-op, Inc.*, 711 N.W.2d 612, 618–19 (S.D. 2006); *Raymond v. Int'l Bus. Mach. Corps.*, 954 F. Supp. 744, 751 (D. Vt. 1997).

In addition, many of the cases that give employers deference in termination decisions involve situations where the parties have only stated that termination may occur for "just cause" or similar vague phraseology. *Sw. Gas Corp. v. Vargas*, 901 P.2d 693, 695 (Nev. 1995); *Simpson v. W. Graphics Corp.*, 643 P.2d 1276, 1277 (Or. 1982); *Baldwin v. Sisters of Providence in Washington, Inc.*, 769 P.2d 298, 299 (Wash. 1989). It may be argued, I suppose, that the phrase "just cause" standing alone might be interpreted to include within its scope any reasonable and legitimate business reason. There is simply no reason to believe, however, that many of these courts would extend their judicial creativity to express contracts where the parties have agreed upon specific and detailed termination provisions in a written contract. To adopt the notion of implied employer deference in this case attacks *Toussaint* and its progeny not at its weakest position, but at its strongest point.

More importantly, however, the cases of *this* court support my view. In many cases in many contexts, we have repeatedly and in strong terms refused to supply terms that the parties for whatever reason chose not to include. In *Smith v. Stowell*, 256 Iowa 165, 172, 125 N.W.2d 795, 799 (1964), this court declared in stentorian terms,

> [T]he court may not rewrite the contract for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice, or under the rule of liberal construction, make for the parties a contract which they did not make for themselves, or make for them a better contract than they chose, or saw fit, to make for themselves. . . .

More recently, in *Thomas v. Progressive Casualty Insurance Co.*, 749 N.W.2d 678, 681–82 (Iowa 2008), we again firmly laid down the gauntlet against contractual heretics, reaffirming that courts have no province to rewrite insurance contracts.

And that's not all. Even where parties expressly agree to indefinite terms to be determined in the future, we refuse to assist the parties by providing judicial resolution. *Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 453 (Iowa 1990). *Air Host* rightly insists that the parties themselves must be accountable for their own contractual terms.

Further, this court cited *Toussaint* favorably in *Hunter v. Board of Trustees of Broadlawns Medical Center*, 481 N.W.2d 510, 516 (Iowa 1992). In *Hunter*, we noted that a jury was always entitled to determine the true reason for a discharge. There is no mention in *Hunter* of some kind of shroud of objective reasonableness that limited the power of the jury to make factual determinations.

The majority opinion has got it right. In Iowa, parties to an employment contract are generally free to negotiate their own terms. If

an employer wishes to protect its freedom of action in termination decisions, it can seek to negotiate whatever terms it deems desirable. Where the employer, however, expressly agrees to a contract that establishes with specificity the reasons for potential dismissal, but does not expressly provide broad discretion in making dismissal decisions, the law requires a court to do its duty and simply enforce the contract according to its terms. The implied-employer-deference approach would require us to depart from well-established contract principles, impose what amounts to a reverse doctrine of good faith and fair dealing, and empower this court to sit as some kind of omniscient commerce commission to feather into private contracts terms that a transient majority of the court believe are desirable. The court wisely has declined to follow this path.